[No. 64029-1-I. Division One. September 12, 2011.]

THE STATE OF WASHINGTON, *Respondent*, v. JAMES ERIC GROTH, *Appellant*.

*Elaine L Winters* (of *Washington Appellate Project*), for appellant.

*Daniel T. Satterberg, Prosecuting Attorney,* and *Andrea R. Vitalich, Deputy,* for respondent.

 

¶1 ELLINGTON, J. — In 1975, Diana Peterson was murdered. In 2009, James Groth was convicted of the crime. In the interim, most of the physical evidence had been destroyed. Groth presents a number of issues on appeal. We affirm.

## BACKGROUND

¶2 Early on the morning of February 15, 1975, George Peterson discovered his 16-year-old daughter's body lying face up in the backyard. He told his wife, called the police and a priest, and covered her body with blankets. Before detectives and crime laboratory personnel could process the scene, the priest, medics, and a deputy sheriff also approached the body.

¶3 On his arrival, King County Sheriff's Detective Rolf Grunden observed two sets of fresh footprints at the scene and took photographs. One set of prints had a "stars and bars" tread pattern.[1] Grunden took care that the footprints would not be stepped on by others. Detectives prepared casts of three footwear impressions.

---

[1] Report of Proceedings (RP) (May 13, 2009) at 719.

¶4 Diana Peterson's body remained as her father found it until personnel from the medical examiner's office arrived at about 2:15 p.m. Only then was the body moved and the cause of death revealed: a large, bone-handled hunting knife penetrating her back. A single stab wound caused her lung to collapse.

¶5 Interviews with Diana's mother, Leanne, and sister Marilyn established that Diana was killed shortly after 10:30 p.m. on Friday, February 14. Leanne heard Diana come home at approximately that time, and soon afterward she and Marilyn heard noises in the backyard. Leanne thought she heard Diana scream, but not in a way that caused her alarm. Marilyn thought she heard someone say "stop it" or "don't" in a playful way.[2] Leanne opened the window, told her daughter to be quiet, and saw "two shadows, very close together," which appeared to be Diana and another person playing or struggling.[3]

¶6 Leanne walked outside and called Diana's name, but there was no response. She assumed Diana had snuck out of the house as she often did, so she let Diana's dog out and locked the door.

¶7 The police initially focused their investigation on Diana's 19-year-old boyfriend and next-door neighbor, Tim Diener. Diener owned the hunting knife that killed Diana. But all the neighborhood kids knew about and liked to handle the knife, which Diener kept in plain view in his basement bedroom. The basement door was always unlocked, meaning that anyone who knew about the knife had access to it.

¶8 When police first interviewed Diener on February 15, 1975, he reported that he had been at a friend's house the night before until around 11:00 p.m., and that he heard Diana's dog barking in the yard when he got home. Diener's

---

[2] RP (May 12, 2009) at 555.

[3] *Id.* at 595.

friend Dean Blackburn confirmed that Diener was with him until shortly after 11:00 p.m.

¶9 Diener was arrested on February 19, 1975. Police seized the clothing and boots he was wearing and also the clothing he had been wearing on the night of the murder. Diener was released the next day and never charged.

¶10 James Groth lived two houses away from the Petersons and often spent time at their home. He was a little younger than Diana and liked to hang out with her and her sisters. Some witnesses suspected he was infatuated with Diana.

¶11 Groth was at the Petersons' home on the night of the murder but left after Diana went to get pizza with her friends. In his first interview with police, Groth said he went to a friend's house, and then to a neighborhood bowling alley, and arrived home after 12:30 a.m. On his way home, he checked Diener's house and found him asleep. Groth did not mention seeing Diana's body.

¶12 In a second statement to police three days later, however, Groth admitted his first statement was incorrect. He said that he left the bowling alley at about 10:10 p.m. and checked Diener's house but no one was there. Groth said he then cut through the Petersons' backyard on his way home, and found Diana's dead body "laying face down right by the rockery" with "a knife handle sticking out of her back."[4] Groth said he was frightened and ran to Richmond Beach to think. He then went briefly to the bowling alley and returned home. Groth said he did not tell anyone what he had seen because he did not want to get involved or be accused.

¶13 The police twice interviewed Steve Larson, another neighbor of the Petersons. His written statement, prepared by Detective Roger Dunn, indicated that when Larson came home from a friend's house about noon on the day Diana's

---

[4] RP (May 18, 2009) at 1082.

body was found, Groth told him Diana had been killed, probably beaten, and Diener told him Diana had been "knifed."[5] This occurred more than two hours before the medical examiner turned Diana's body over and discovered she had been stabbed. At trial, however, Larson testified he had a "vivid picture" of the interaction and was "almost certain" it was Groth, rather than Diener, who told him Diana had been knifed.[6] The detective testified he may have inadvertently switched the names in preparing Larson's statement.

¶14 About six weeks after the murder, Eric Hansen was working at a *Seattle Times* newspaper shack when he had a confrontation with Groth. Groth pushed Hansen and knocked his glasses off. When Hansen threatened to tell his father, Groth replied, "I've killed a girl and I can kill again."[7]

¶15 The investigation went cold.[8] Although two detectives filled out forms in 1976 and 1978 requesting that the physical evidence be preserved indefinitely, in 1987 a sergeant ordered destruction of all the physical evidence except the murder weapon and the crime-scene photographs. No fingerprints were found on the knife when it was tested in 1995, and no DNA profile could be obtained in 2004.

¶16 In April 2006, Detective Jim Allen reopened the investigation. He searched for lab reports from any tests that might have been conducted before the evidence was disposed of, but found none. Allen concluded from Leanne's and Marilyn's statements that Diana was stabbed between

---

[5] RP (May 19, 2009) at 1399.

[6] *Id.* at 1402-03.

[7] RP (May 14, 2009) at 973.

[8] This may have been due, in part, to the resources devoted to the investigation of serial killings eventually tied to Ted Bundy. Detective Grunden testified that two of the detectives assigned to the Peterson case were transferred to the Bundy task force and that the sheriff's office was "overwhelmed." RP (May 13, 2009) at 813.

10:35 and 10:45 p.m. on February 14, 1975. He focused his attention on Groth because Diener's friends had established he was not in the area at that time.

¶17 Detective Allen interviewed Groth in May 2006. During their first meeting, Groth made no mention of finding Diana's body until Allen pointed out that he had talked about that in his second statement to police in 1975. During his second interview, Allen accused Groth of holding back information. Groth slumped in his chair, put his head down, and "teared up a little bit."[9] Groth became angry and agitated when pressed for details about finding the body. He did not deny killing Diana until Allen pointed out that he had not denied it, and his subsequent denial was "very weak."[10] At the end of the interview, Groth agreed to provide a deoxyribonucleic acid (DNA) sample and indicated he wanted to talk with detectives again to clear things up.

¶18 Groth showed up at the next meeting but had decided "he wanted to talk to some people before he really sat down with [the detectives] again and talked any further."[11] In response to Detective Allen's comments and questions, Groth agreed that he had something important to tell them "such as [Groth] was there at the time of the murder or [had] some explanation."[12] He spoke to police again but did not submit to additional interviews.

¶19 In December 2007, Groth was arrested and charged with murder in the first degree. His motion to dismiss on grounds that the State violated his due process rights by destroying material evidence was denied.

¶20 The crime-scene photographs included a picture of Groth's shoes, showing Vibram brand soles. Detective Allen

[9] RP (May 26, 2009) at 1478-79.

[10] *Id.* at 1479.

[11] *Id.* at 1482.

[12] *Id.* at 1483.

provided the photographs to Joel Hardin, a master tracker, and asked if he could find any evidence of those shoes having been at the scene.

¶21 Hardin testified he examined the photographs and concluded that there were "two persons in the same area moving their feet about, but not really going anywhere" at "virtually the same time" on the night of the murder.[13] One person was wearing stars and bars tread boots consistent with Groth's Vibram soles; the other was wearing a flat, gum-rubber-soled shoe consistent with Diana's "Wallabees."[14] Hardin also testified he could tell that all of the stars and bars patterned shoe prints were made by the same individual, and that that individual stepped in blood at approximately the same time the blood dripped onto the ground.

¶22 The defense experts strenuously disagreed with Hardin's conclusions from the photographs. Forensic scientist William Bodziak testified he could discern no impressions from a flat-soled shoe, saw no evidence that footwear impressions were intermingled, and stated it was not possible to determine the time at which any of the partial impressions were left.

¶23 The jury found Groth guilty of the lesser included offense of murder in the second degree. He was sentenced to a maximum term of life with a recommended minimum of 200 months.

## DISCUSSION

### *Destruction of Evidence*

¶24 Groth first contends the destruction of physical evidence violated due process and required dismissal under

---

[13] RP (May 20, 2009) at 59, 87.

[14] *Id.* at 58.

the standard established by *Arizona v. Youngblood*[15] and *State v. Wittenbarger*.[16] Because the evidence at issue was only potentially useful, and no bad faith on the part of law enforcement has been established, we must disagree.

▆ ¶25 Under *Youngblood* and *Wittenbarger*, whether destruction of evidence constitutes a due process violation depends on the nature of the evidence and the motivation of law enforcement. If the State fails to preserve "material exculpatory evidence," criminal charges must be dismissed.[17] But under *Youngblood* and *Wittenbarger*, this is a very narrow category:

> In order to be considered "material exculpatory evidence", the evidence must both possess *an exculpatory value that was apparent before it was destroyed* and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.[18]

¶26 On the other hand, the State's failure to preserve evidence that is merely "potentially useful" does not violate due process unless the defendant can show bad faith on the part of police.[19] "Potentially useful" evidence is "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant."[20]

¶27 The physical evidence collected in this case was considerable. In addition to the murder weapon, investigators collected plaster casts of footwear impressions from the Petersons' backyard; blood samples found at the scene; samples of the victim's clothing, blood, hair, and fingernail scrapings from the autopsy; Diener's boots and clothing

---

[15] 488 U.S. 51, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988).

[16] 124 Wn.2d 467, 880 P.2d 517 (1994).

[17] *Id.* at 475.

[18] *Id.* (emphasis added).

[19] *Youngblood*, 488 U.S. at 58; *Wittenbarger*, 124 Wn.2d at 477.

[20] *Youngblood*, 488 U.S. at 57; *Wittenbarger*, 124 Wn.2d at 477.

from the night of the murder; laboratory analyses, if any, of the physical evidence; and the crime laboratory analyst's notes, reports, and conclusions concerning forensic testing.

¶28 Groth contends this was material, exculpatory evidence and the charges against him therefore should have been dismissed. He relies on the premise that since he was not arrested in 1975, the evidence "probably exonerated him."[21] The record does not support this speculation. Although Groth was never arrested, neither was he ruled out as a suspect.[22] Further, none of the evidence has apparent exculpatory value without testing or analysis, and it is not clear that any testing or analysis was completed before the evidence was destroyed.[23] The court properly ruled the evidence was only "potentially material."[24] Under *Youngblood* and *Wittenbarger*, there was no due process violation unless Groth can show the evidence was destroyed in bad faith.

■ ¶29 "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed."[25]

---

[21] Br. of Appellant at 25.

[22] *See* RP (May 26, 2009) at 1449 (Detective Allen noted that "Groth had been identified as a suspect originally, but there wasn't much in the way of investigation into that aspect.").

[23] Crime laboratory analyst Kay Sweeney testified he "looked at" or "examined" the evidence before it was destroyed, but had no independent memory of what he had done. RP (May 14, 2009) at 933. One detective's undated report indicated Sweeney "did examine all the evidence in the case," but at trial, Sweeney could say for sure only that he "looked at the knife." *Id.* He was not asked to "look at their blood spatter evidence in this case," and did not remember testing traces of blood found inside the pocket of Diener's pants. *Id.* at 935, 928. He did not remember examining Diana's clothes for trace evidence, although that was part of his routine. *Id.* at 940. He did not remember testing the material under Diana's fingernails, although that was also standard procedure. *Id.* at 945. He could not say whether Groth's or Diener's boots were tested to determine if either had walked in blood. *Id.* at 947. He could not say whether a hair packaged with the knife had been compared to Diana's, Groth's, or Diener's hair. *Id.* at 949.

[24] Clerk's Papers at 276.

[25] *Youngblood*, 488 U.S. at 56 n.*.

Thus, a defendant must show the destruction "was improperly motivated."[26] Groth makes no such showing.

¶30 It is unclear why the evidence was destroyed. The State represents that the evidence was destroyed when Sergeant Harlan Bollinger "made a decision to clear out evidence in many cases in the 1980s due to a lack of storage space."[27] But former crime laboratory director Kay Sweeney testified there was not so much material in this case that it would have been a "burden" to store it over the years.[28] Sweeney also testified that any laboratory reports would have been prepared in triplicate and kept in three different places, but evidently every copy had been lost.

¶31 There is no indication that the sheriff's office knew of any exculpatory aspect of the evidence or that its destruction in 1987 was improperly motivated. To the extent any conclusions can be drawn from the record, it appears the sheriff's office negligently destroyed evidence of which any exculpatory value was not apparent. This does not meet the standard of bad faith required under *Youngblood* and *Wittenbarger*.

¶32 Our Supreme Court has found an absence of bad faith when a government agency follows its own protocols in destroying evidence of a crime.[29] Groth contends the converse must also be true, that the destruction of evidence that is *contrary* to policy *must* demonstrate bad faith. He cites two federal district-court cases and one appellate case from Ohio to support this proposition. But in each of these cases, the destruction of evidence was in violation of explicit policy and procedures and, in any event, did not ipso facto

---

[26] *Wittenbarger*, 124 Wn.2d at 478.

[27] Br. of Resp't at 14.

[28] RP (May 14, 2009) at 942.

[29] *See Wittenbarger*, 124 Wn.2d at 477-79 (defendants conceded State acted in compliance with established policy; court rejects argument that the policy was adopted in bad faith); *State v. Ortiz*, 119 Wn.2d 294, 302, 831 P.2d 1060 (1992) (State did not act in bad faith when it handled samples "in its usual manner").

establish bad faith.[30] Here, in contrast, there is no evidence that any explicit regulation or policy was violated. While Sweeney testified that evidence in an open case would not "routinely" be destroyed, he identified no official policy against it. Further, Sergeant Bollinger's written authorization indicates the evidence should be destroyed "per R.C.W. and department regulations."[31] Groth has not established bad faith.

## Washington Constitution

¶33 Groth next argues Washington's due process clause is more protective than its federal counterpart in cases where the government destroys material evidence of a crime. He points to pervasive criticism of the *Youngblood* decision and urges a return to *State v. Vaster*,[32] Washington's former test for evaluating cases involving destruction of evidence. Under *Vaster*, a criminal defendant must show that there is "a reasonable possibility that the missing evidence would have affected the defendant's ability to present a defense," and the court must then balance this possibility against the ability of the State to preserve the evidence, the nature of the evidence, and the circumstances of its loss.[33]

¶34 Because it does not turn on the motivation of law enforcement, the *Vaster* test escapes the chief criticism of

---

[30] *See United States v. Elliott*, 83 F. Supp. 2d 637, 647 (E.D. Va. 1999) (failure to follow "established procedures" that were "clear and unambiguous" is probative evidence of bad faith but does not *"ipso facto* establish bad faith"); *United States v. Montgomery*, 676 F. Supp. 2d 1218, 1245 (D. Kan. 2009) (government's destruction of marijuana plants without documenting their number violated explicit Drug Enforcement Administration policy and was one factor weighing "strongly in favor of bad faith"); *State v. Durnwald,* 163 Ohio App. 3d 361, 371, 2005-Ohio-4867, 837 N.E.2d 1234 (accidental erasure of video documenting a stop for driving under the influence stop in violation of state patrol policy "encompasses more than mere negligence or an error in judgment"; rather, "such a continuing cavalier attitude toward the preservation of . . . videotape evidence rises to the level of bad faith").

[31] Clerk's Papers at 107.

[32] 99 Wn.2d 44, 659 P.2d 528 (1983).

[33] *Id.* at 52 (emphasis omitted).

*Youngblood* and offers greater due process protection. As the *Youngblood* concurring and dissenting justices articulated, the emphasis on bad faith offers no remedy where "the defendant is unable to prove that the State acted in bad faith but in which the loss or destruction of evidence is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair."[34] At least 10 other state courts have rejected *Youngblood* under their own constitutions.[35]

¶35 Whether *Vaster* provides the better approach, however, is a question for our Supreme Court. In *Wittenbarger*, the court held our state constitution does not require a return to *Vaster*. It is therefore up to that court to revisit the issue; we are bound by *Wittenbarger*.

### Expert-Opinion Evidence

¶36 The admission of expert testimony is governed by Evidence Rule (ER) 702 and requires a case-by-case analysis.[36] Under ER 702, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Thus, admissibility depends on whether " '(1) the witness qualifies as an expert, (2) the

---

[34] *Youngblood*, 488 U.S. at 61 (Stevens, J., concurring), 66 (Blackmun, J., dissenting) ("it makes no sense to ignore the fact that a defendant has been denied a fair trial because the State allowed evidence that was material to the defense to deteriorate beyond the point of usefulness, simply because the police were inept rather than malicious); *see also* Norman C. Bay, *Old Blood, Bad Blood, and* Youngblood*: Due Process, Lost Evidence, and the Limits of Bad Faith*, 86 WASH. U. L. REV. 241, 287-93 (2008). This criticism is especially well taken, given Youngblood's eventual exoneration when the trace evidence remaining was subjected to more sophisticated testing techniques.

[35] *See Illinois v. Fisher*, 540 U.S. 544, 549 n.*, 124 S. Ct. 1200, 157 L. Ed. 2d 1060 (2004) (Stevens, J., concurring) (citing "a number of state courts [that] have held as a matter of state constitutional law that the loss or destruction of evidence critical to the defense does violate due process, even in the absence of bad faith"); *see also* Bay, *supra*, at 287-89 & n.364.

[36] *State v. Willis*, 151 Wn.2d 255, 87 P.3d 1164 (2004).

opinion is based upon an explanatory theory generally accepted in the scientific community, and (3) the expert testimony would be helpful to the trier of fact.' "[37]

¶37 The trial court admitted Joel Hardin's testimony after an extensive three-day hearing. Hardin established his credentials as a human tracker and described how he interpreted "sign" from the crime-scene photographs in this case. Hardin examined enlarged photographs with a low-powered magnifying glass and testified they show overlapping impressions indicating that two individuals, wearing shoes with soles consistent with those of the defendant and victim, were physically engaged on the night of the murder.

¶38 Hardin stated in his report that the intermingled prints were "the result of two persons being within the personal presence of each other and moving their feet in some physical actions, such as dancing or struggling together."[38] Hardin also opined that "the footprint impressions are of the time frame as to have been made after 5:00 p.m. in the evening of February 14th and prior to the time the body was discovered at 6:00 a.m. the next morning."[39]

¶39 Although Hardin admitted he "cannot identify the wearer of the stars and bars patterned shoes" or "identify the stars and bars patterned shoes as those shown in" the photograph of Groth's shoes, he opined "with confidence that only one person was wearing the stars and bars patterned shoes in the areas captured in the photographs during this time frame."[40] He further stated that person was physically engaged with the victim in at least two different locations and "was at the scene after the victim was stabbed and ambulatory and stepped on the blood drips

---

[37] *Id.* at 262 (internal quotation marks omitted) (quoting *State v. Swan*, 114 Wn.2d 613, 655, 790 P.2d 610 (1990)).

[38] Ex. 185 at 17.

[39] *Id.*

[40] *Id.* at 18.

and drops."[41] Hardin's testimony was supported by that of King County Sheriff's Office Detective Kathleen Decker, also a certified "sign cutter."

¶40 Groth contends the court erred by admitting Hardin's testimony because his conclusions were unreliable, were not within his expertise, and were unhelpful to the jury. The essence of Groth's argument is that although Hardin is a well-recognized expert in real-time tracking, those skills do not qualify him to render an opinion about footwear impressions and crime scene reconstruction based only upon photographs. The decision to admit or exclude expert testimony is reviewed for abuse of discretion,[42] and while the circumstances are surely unusual, we see no abuse of discretion here.

¶41 Tracking is "finding the discoverable evidence of a person and understanding, recognizing, identifying that evidence, and relating it to a specific time, place, [or] event."[43] As such, the field is broad and doubtless overlaps somewhat the more scientific disciplines of footwear impression analysis and crime scene reconstruction. But that would be so even if Hardin's testimony were based upon contemporaneous observation of the crime scene. The fact that Hardin's expertise closely relates to other fields does not disqualify him as an expert in his own. The fact that his field is not scientific discipline is hardly determinative; Hardin has repeatedly testified as an expert based upon his skills and experience.[44]

¶42 Nor does Hardin's reliance on photographs necessarily preclude his testimony. The court found that "[a]lthough examining sign from photographs is not ideal, and may have limitations, a tracker's experience and training may allow him to formulate conclusions solely from a photo-

---

[41] *Id.*

[42] *Ortiz*, 119 Wn.2d at 310.

[43] RP (Mar. 16, 2009) at 6.

[44] *See Ortiz*, 119 Wn.2d at 310-11.

graph."[45] This was based upon the evidence and was not an unreasonable conclusion.

■ ¶43 Groth also argues Hardin's testimony should not have been admitted because it was not helpful to the jury. Expert testimony is helpful to the jury if it concerns matters beyond the common knowledge of the average layperson and is not misleading.[46] "Courts generally 'interpret possible helpfulness to the trier of fact broadly and will favor admissibility in doubtful cases.' "[47]

¶44 Groth argues Hardin's testimony was not helpful because "the jury was just as capable of looking at the photographs with a magnifying glass as Mr. Hardin."[48] But as the defense experts made clear, it is difficult to discern the "sign" Hardin identified in the photographs. Hardin testified his expertise made it possible for him to recognize and interpret what others would overlook. Hardin's testimony therefore concerned matters beyond the layperson's knowledge, and the court did not abuse its discretion by concluding, implicitly, that the testimony would be helpful to the jury.

■ ¶45 Finally, we note that defense experts William Bodziak and John Nordby mounted a compelling response to Hardin's testimony. They were highly critical of Hardin's methodology and conclusions, and testified that they could not see what Hardin claimed to see in the photographs and that the quality and scale of the photographs were inadequate for rigorous scientific analysis. The jury was thus presented with ample basis for evaluating Hardin's conclusion.

---

[45] Clerk's Papers at 278. The court further concluded that Hardin's reliance on photographs did not trigger the *Frye* requirements. *Frye v. United States*, 54 App. D.C. 46, 47, 293 F. 1013 (1923). Groth does not assign error to that ruling.

[46] *State v. Thomas*, 123 Wn. App. 771, 778, 98 P.3d 1258 (2004).

[47] *Moore v. Hagge*, 158 Wn. App. 137, 155, 241 P.3d 787 (2010) (internal quotation marks omitted) (quoting *Miller v. Likins*, 109 Wn. App. 140, 148, 34 P.3d 835 (2001)), *review denied*, 171 Wn.2d 1004, 249 P.3d 181 (2011).

[48] Br. of Appellant at 54.

## Sufficiency of the Evidence

¶46 Groth next contends there was insufficient evidence to prove he killed Diana.[49] Evidence is sufficient to support a conviction if, when viewed in the light most favorable to the State, any rational juror could have found the essential elements of the crime beyond a reasonable doubt.[50] A defendant who challenges the sufficiency of the evidence admits the truth of all evidence and reasonable inferences therefrom.[51]

¶47 Although circumstantial, the evidence against Groth was substantial. His infatuation with Diana and jealousy of her relationship with Diener gave him a motive for the Valentine's Day murder. Groth had access to the murder weapon, and he knew that Diana had been "knifed" before anyone else did, including family and police. And within weeks after the murder, Groth told a peer that he had "killed a girl" and could do it again.[52]

¶48 Groth's statements to police also point to his guilt. He failed to disclose that he had seen Diana's body during his initial police interview. When he later admitted he had, he stated he found her dead, face down with the knife in her back. But the forensic evidence indicated that could not be so. Diana was likely immobilized within minutes after she was stabbed, could not have been face down for more than a few moments, and died on her back. For Groth to have seen Diana face down, he had to have been there while she was still alive. Yet Groth claimed he confirmed she was dead by pushing her with his shoe before running off. He also claimed she was covered with blood on her back and

---

[49] To convict Groth of murder in the second degree, the State had to prove that, with intent to cause the death of another person but without premeditation, Groth caused Diana's death. RCW 9A.32.050(1)(a).

[50] *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

[51] *Id.*

[52] RP (May 14, 2009) at 973.

hands. This too would not have been observable except within minutes of the stabbing.

¶49 When the police interviewed Groth in 2006, he again failed to mention discovering Diana's body until prompted. He became angry when pressed for details. He was sullen and tearful when detectives accused him of holding back information or having been involved in the crime. He nodded when detectives suggested he had something important to say "such as [he was] there at the time of the murder or [had] some explanation."[53]

¶50 Finally, Hardin testified that the person wearing the stars and bars patterned shoes was with Diana when she was stabbed but still ambulatory, that only one person made those prints, and that the prints were consistent with Groth's footwear.

¶51 Groth argues the evidence points as clearly to Diener as it does to him. That is not so. Although Diener's knife was the murder weapon, the evidence established that Diener's home was always unlocked and its contents, including the knife, were accessible to anyone. Groth had been in Diener's home frequently and knew about the knife. Further, the evidence was that Diener was with friends until around 11:00 p.m. and that Diana was stabbed before then. Groth points to Diener's reluctance to cooperate with police after he was arrested and released. But Diener had retained counsel and had been advised not to speak to police. He nevertheless permitted police to seize the clothes he wore on the night of the murder. And once the investigation resumed in 2006, Diener cooperated further.

¶52 Viewed in the State's favor, this evidence is ample to support Groth's conviction.

### Prosecutorial Misconduct

¶53 Groth contends the prosecutor committed reversible misconduct by (1) misstating the burden of proof beyond a

---

[53] RP (May 26, 2009) at 1483.

reasonable doubt, (2) misstating the law concerning circumstantial evidence, and (3) misinforming the jury concerning their use of the court's missing evidence instruction.

¶54 To prevail on a claim of prosecutorial misconduct, the defendant must show that the prosecutor's conduct was both improper and prejudicial.[54] To establish prejudice, the defendant must show a substantial likelihood the misconduct affected the jury's verdict.[55] The defendant's failure to make a timely objection constitutes waiver unless the remark is so flagrant and ill intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by a curative instruction.[56]

¶55 Groth claims the State misrepresented the burden of proof in closing argument by stating that the case presented some "unanswered questions," but that "doesn't equal reasonable doubt."[57] These unanswered questions included "when Jim Groth decided to kill Diana Peterson," "what route Diana Peterson stumbled by that rockery before landing on her back," "whether Jim Groth ended up with any blood on him," and "why the police destroyed that evidence."[58] The prosecutor emphasized the appropriate burden of proof when she further argued the jury need not answer those questions to find Groth guilty: "You just have to be convinced beyond a reasonable doubt that he committed this crime."[59] In the context of a 34-year-old case in which most of the physical evidence had been destroyed, this argument was not improper.

¶56 We need not address the merits of Groth's arguments with respect to whether the prosecutor misstated the

---

[54] *State v. Stenson*, 132 Wn.2d 668, 718, 940 P.2d 1239 (1997).

[55] *Id.* at 718-19.

[56] *Id.* at 719.

[57] RP (May 28, 2009) at 131.

[58] *Id.* at 77-78.

[59] *Id.* at 79.

jury instruction on circumstantial evidence or the permissive inference that the missing evidence would not have been unfavorable to the State. Even if these remarks were improper, a curative instruction could easily have corrected any misstatements. Groth's failure to object therefore waived any error.

### Ineffective Assistance of Counsel

¶57 Groth contends his counsel's failure to participate at the sentencing hearing deprived him of effective assistance of counsel. Sentencing in this case was complicated because the crime was committed while Groth was a juvenile, before the Sentencing Reform Act of 1981, chapter 9.94A RCW, and the Juvenile Justice Act of 1977, chapter 13.40 RCW. Although these factors may have given counsel fodder to argue against the State's recommended sentence, counsel essentially refused to make any argument at the hearing.[60]

¶58 We are troubled by counsel's behavior. However, both counsel and the court made reference to a defense sentencing memorandum that has not been furnished on appeal. The absence of this memorandum renders the record insufficient for meaningful review of Groth's claim of ineffective assistance. If Groth wishes a reviewing court to consider matters outside the record, he may bring a personal restraint petition.[61]

¶59 Affirmed.

DWYER, C.J., and SCHINDLER, J., concur.

---

[60] Counsel stated, "I don't have a recommendation for a sentence for a man I believe is innocent. Mr. Groth maintains his innocence. The court is going to have to make a determination on its own." RP (July 24, 2009) at 1871.

[61] *State v. McFarland*, 127 Wn.2d 322, 337-38, 899 P.2d 1251 (1995).