# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 68725-5-I |
| | ) | consolidated with |
| Respondent, | ) | No. 68747-6-I |
| | ) | |
| v. | ) | |
| | ) | |
| LEONARD PEGS, JR., | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |
| STATE OF WASHINGTON, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JAMES E. BALLOU, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: December 30, 2013 |
| | ) | |

2013 DEC 30 AM 10: 56
COURT OF APPEALS DIV I
STATE OF WASHINGTON
FILED

VERELLEN, J. — Leonard Pegs, Jr. and James Ballou appeal their convictions for second degree burglary. Pegs contends the State failed to preserve video surveillance footage helpful to his case. He further contends that the best evidence rule precludes the admission of secondary testimony related to the surveillance footage, and that the court erred in allowing lay witnesses to give opinion testimony identifying the defendants in the surveillance footage. Pegs and Ballou each contend the court abused its discretion in allowing evidence of prior bad acts under

ER 404(b), and further argue the court erred in refusing to instruct the jury on the definition of "property."

There is no evidence the police acted in bad faith in failing to secure the surveillance footage. The court did not abuse its discretion in admitting testimony about the contents of the surveillance footage. Two witnesses who viewed the surveillance footage had significant interaction with the defendants before viewing the surveillance footage, rendering their testimony helpful to the jury. In any event, any error in admitting such opinion testimony was harmless. The trial court did not abuse its discretion under ER 404(b) in allowing the store manager to testify he had met Ballou in the past. Finally, the instructions given allowed the defendants to argue their theory, the court did not err in refusing to instruct the jury on the definition of property, and any alleged error was harmless.

Pegs also challenges his sentence, contending the court erred when it recognized he was eligible for the parenting sentencing alternative[1] but nevertheless declined to give him an alternative sentence. The trial court noted Pegs' significant criminal history, consistent with the legislature's directive that courts consider criminal history in determining whether the parenting sentencing alternative is appropriate. Pegs does not establish that the trial court abused or failed to exercise its discretion in declining to give the alternative sentence.

We affirm.

---

[1] RCW 9.94A.644.

2

## FACTS

On November 1, 2009, Leonard Pegs, Jr. and James Ballou arrived at Toys 'R Us in Lynnwood. The two men went to separate areas of the store. Department supervisor Christopher Blaine observed Ballou in the "R Zone," a separate section of the store containing electronics items. Ballou was pacing around near the R Zone on his phone and asked an employee to show him some keyboards in another section of the store. When Blaine offered Ballou assistance, Ballou told Blaine "never mind."[2] Blaine then notified store manager Darin Jorgensen that they had a "Code Jeffrey," the store code for a suspicious situation.

Blaine and Jorgensen then observed Ballou pushing a shopping cart with a cardboard box in it toward the store exit without stopping at any cash register. The box had red and white tape with a white label normally used for electronic merchandise in the R Zone. Both Blaine and Jorgensen observed Pegs exit a few steps behind Ballou. Jorgensen called after them to stop, but they sped up and continued out the door into the parking lot, where a black Jaguar was parked. Jorgensen followed them outside and called 911. When Jorgensen loudly provided police with a description of the car and license number, Pegs and Ballou looked at Jorgensen and then together, they lifted the box from the cart and dropped it into the trunk. When the box landed in the trunk, Jorgensen heard a thud and saw the car suspension shift. Pegs and Ballou drove away in the Jaguar. Jorgensen ran after them while describing their route to the 911 dispatcher.

---

[2] Report of Proceedings (RP) (Mar. 28, 2012) at 295.

Officer Justin Gann received the dispatch and stopped the Jaguar about seven minutes later. Pegs and Ballou were detained for investigation. Jorgensen arrived and identified Pegs and Ballou as the two men he had seen in the store.

While Officer Gann was detaining Pegs and Ballou, Blaine watched the Toys 'R Us security video surveillance footage. At trial, Blaine testified about what he saw on the video footage. He saw Pegs go to the back storage room door, near the R Zone. The door is marked "for authorized personnel only." He saw Pegs open the door after moving his hand around near the door. The door automatically locks and normally can be opened only by employees with a key.

Blaine then switched to the camera that showed the interior of the R Zone storeroom. He testified the footage showed Pegs unload one of the boxes in the storeroom and put several Nintendo DS game systems into the box. The box in the video had the red and white tape with a white label normally used for electronic merchandise in the R Zone. While filling up the box, Pegs periodically looked out the small window in the storeroom door and put his phone to his ear. Pegs then put the box on the floor just outside the storeroom door. A few minutes later, Ballou came by the storeroom door with a shopping cart. Ballou pushed the cart containing the electronics box toward the exit. The surveillance video did not reveal and Blaine did not see firsthand anyone else leaving the store with such a box in a cart.

Jorgensen returned to the store after calling 911 and watched the surveillance video several times. At trial, Jorgensen testified about what he had seen on the

4

surveillance footage, providing an almost[3] identical account of what Blaine had seen on the footage. Jorgensen testified that the videotape included the faces of the individuals. He recognized himself in portions of the tape near the front of the store when Pegs and Ballou were leaving the store. Pegs and Ballou "were the only two black customers in the store at that time."[4] They were wearing the same clothes in the tape as they were wearing in the store and at the show-up.

Finally, Officer Gann also watched parts of the video. Gann testified that he observed Pegs' face on the video footage to confirm Jorgensen's identification of Pegs.

Officer Gann asked Jorgensen for a copy of the video. Jorgensen tried to make a copy, but the system malfunctioned. Officer Gann instructed Jorgensen that the police needed the video as soon as possible. Officer Gann contacted Jorgensen the next day to follow up, but Jorgensen replied that he was still having difficulty making a copy. Officer Gann did not take the entire surveillance device because that would have left Toys 'R Us without surveillance for the whole store, and Officer Gann felt that "was not reasonable."[5] Officer Gann never received a copy of the video. Jorgensen testified that the drive on the video recorder would not open, so he could not make a copy. Toys 'R Us then replaced the video surveillance equipment, destroying the old footage.

---

[3] Jorgensen testified that the surveillance showed Pegs loading the box on the cart, a detail not included in Blaine's testimony.

[4] RP (Mar. 27, 2012) at 115.

[5] RP (Mar. 28, 2012) at 229.

Police obtained a warrant to search the Jaguar the day after the incident. They found a box in the trunk matching the description of the electronics box Pegs and Ballou removed from the store in the shopping cart, but the box was empty. Police did not endeavor to locate the purported contents. Jorgensen and Blaine testified that several Nintendo DS game systems were missing from inventory, for a total loss to the store of $5,779.62.

The State charged Pegs and Ballou as codefendants with burglary in the second degree and organized retail theft in the first degree. The defendants moved to dismiss under CrR 8.3(b) for the State's failure to preserve the security video. They also moved in limine to prevent testimony about the identity of the persons depicted in the surveillance footage. Finally, they moved to exclude witness testimony identifying the individuals in the footage based on the best evidence rule. The court denied all the motions. The case proceeded to trial, but ended in mistrial due to juror misconduct.

The State then filed an amended information charging both defendants only with burglary in the second degree. The State alleged the two entered into the Toys 'R Us with intent to commit theft therein. Before the second trial, Pegs and Ballou renewed their pretrial motion to dismiss and motions in limine. The court denied the motions, finding the State was not responsible for the failure to preserve the video, and that its absence went to weight rather than admissibility of what the footage showed.

Pegs and Ballou also moved to exclude under ER 404(b) Jorgensen's testimony that he knew Ballou from before. The court denied the motion because the

testimony related to Jorgensen's credibility when identifying Ballou. The court ruled that Jorgensen could testify that he had met Ballou in the past and that he recognized him.

At the close of trial, the defendants proposed the standard pattern jury instruction defining "property" as "anything of value."[6] The court refused to give the instruction, stating the term "property" is within the common understanding of the jury. The jury found Ballou and Pegs guilty of burglary in the second degree, and the court imposed a standard range sentence of 51 months for both defendants.

## DISCUSSION

*Due Process – Destruction of the Surveillance Footage by Toys 'R Us*

Pegs contends the State's failure to obtain the surveillance footage from Toys 'R Us deprived him of a meaningful opportunity to present a complete defense. To comport with due process, the prosecution must disclose and preserve material exculpatory evidence.[7] The State's failure to preserve material exculpatory evidence requires dismissal of criminal charges.[8] Evidence is exculpatory if it possesses "an exculpatory value that was apparent before it was destroyed" and if it is "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."[9]

---

[6] Clerk's Papers at 73.

[7] State v. Wittenbarger, 124 Wn.2d 467, 474-75, 880 P.2d 517 (1994).

[8] State v. Groth, 163 Wn. App. 548, 557, 261 P.3d 183 (2011), review denied, 173 Wn.2d 1026, 272 P.3d 852 (2012).

[9] Wittenbarger, 124 Wn.2d at 475.

If the evidence does not constitute material exculpatory evidence and is only "potentially useful" to the defense, failure to preserve the evidence does not constitute a due process violation unless the defendant demonstrates bad faith on the part of the State.[10] A showing of bad faith turns on whether the police knew of the exculpatory value of the evidence when it was lost or destroyed.[11] A defendant must show the destruction was improperly motivated.[12]

Here, there is no indication that the surveillance footage was exculpatory. The trial court noted that every indication is that the tape was inculpatory. Officer Gann, Blaine and Jorgensen watched the footage which revealed two men wearing identical clothing to Pegs and Ballou leaving the store with a box filled with electronic game components from Toys 'R Us without paying for them. The court did not err in determining the video surveillance was not exculpatory.

While the State concedes the footage might have been potentially useful evidence, Pegs has not met his burden to show bad faith. As the State highlights, Toys 'R Us did not notify the police the surveillance equipment was being replaced, and therefore the police did not know the recording would be destroyed. Officer Gann requested a copy of the footage on the day of the crime, followed up a day later, and was ultimately frustrated by the unilateral Toys 'R Us decision to replace the surveillance equipment. As the trial court recognized, the police could have obtained the equipment via court order, but the failure to do so did not constitute bad

---

[10] Groth, 163 Wn. App. at 557; State v. Burden, 104 Wn. App. 507, 512, 17 P.3d 1211 (2001).

[11] Groth, 163 Wn. App. at 558.

[12] Id. at 559.

faith. We conclude the trial court correctly determined there was no due process violation.

*Admission of Testimony on Contents of Surveillance Footage*

We review challenges to a court's decisions on the admissibility of evidence for abuse of discretion.[13] A trial court abuses its discretion if its ruling is manifestly unreasonable or exercised on untenable grounds or for untenable reasons.[14]

a. <u>Secondary Evidence and the Best Evidence Rule</u>

Pegs argues that the best evidence rule precludes the admission of any secondary testimony describing the contents of the surveillance footage. Pegs acknowledges that the best evidence rule provides that "[t]he original is not required, and other evidence of the contents of a writing, recording, or photograph is admissible if [a]ll originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith."[15]

As described above, the State did not lose or destroy the footage in bad faith. Pegs argues that the officer did not follow department guidelines, but Officer Gann explained that taking the device would have left the store without any surveillance system. Further, the State immediately requested a copy of the tape and promptly followed up on that request. Toys 'R Us, not the State, took the actions that resulted in destruction of the tape. Therefore, the trial court did not abuse its discretion in

---

[13] <u>State v. Williams</u>, 137 Wn. App. 736, 743, 154 P.3d 322 (2007).

[14] <u>Id.</u>

[15] ER 1004(a).

determining the best evidence rule did not prevent the State from introducing secondary testimony describing the content of the videotape.

### b. Opinion Testimony

Pegs also argues the court erred by allowing Jorgensen, Blaine and Officer Gann to give opinion testimony identifying Pegs and Ballou as the individuals in the destroyed surveillance footage. A witness must testify based on personal knowledge, and a lay witness may give opinion testimony if it is "rationally based on the perception of the witness" and "helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."[16]

The parties all focus on the standard used in State v. Hardy[17] and State v. George.[18] In Hardy, the court noted that "[a] lay witness may give an opinion concerning the identity of a person in a surveillance photograph if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury."[19] Stated slightly differently, opinion testimony on the identity of a person in a photograph or videotape may be appropriate when the witness has had sufficient contact with a defendant.[20] In Hardy, we affirmed the trial court's decision allowing officers to testify about the identities of two defendants

---

[16] ER 602; ER 701.

[17] 76 Wn. App. 188, 884 P.2d 8 (1994), aff'd by State v. Clark, 129 Wn.2d 211, 916 P.2d 384 (1996).

[18] 150 Wn. App. 110, 206 P.3d 697 (2009).

[19] Hardy, 76 Wn. App. at 190.

[20] George, 150 Wn. App. at 118.

appearing in surveillance footage of drug transactions because those officers had known the defendants for several years before identifying them in the footage.[21]

By contrast, in George, Division Two of this court held the trial court abused its discretion in allowing a police officer's lay opinion testimony identifying two defendants as robbers in a poor quality surveillance video.[22] The officer had seen the two defendants, along with seven other men, running from a van used to flee the scene of a robbery.[23] The officer also saw one of the defendants later that day at the hospital.[24] The appellate court noted, "These contacts fall far short of the extensive contacts in Hardy and do not support a finding that the officer knew enough about [the defendants] to express an opinion that they were the robbers shown on the very poor quality video."[25]

George and Hardy may be distinguishable on the basis that in both cases, the jury viewed the videotape and was "free to reach its own conclusion about the identity of [the defendants]."[26] Here, the jury did not have access to the unavailable footage. But even applying George and Hardy, it is arguable that Jorgensen and Blaine had sufficient contacts with Pegs and Ballou such that their opinions identifying Pegs and Ballou as the individuals they saw in the video as well as during the burglary and after the burglary were helpful to the jury and were admissible under Hardy. Officer

---

[21] Hardy, 76 Wn. App. at 190-92.

[22] George, 150 Wn. App. at 115-19.

[23] Id. at 113.

[24] Id. at 115.

[25] Id. at 119.

[26] Hardy, 76 Wn. App. at 191; see also George, 150 Wn. App. at 115.

Gann's testimony is much closer to the opinion testimony held inadmissible in George. But even if all of the lay opinion testimony was improper, any such error is harmless.

Under the best evidence rule, Jorgensen and Blaine were still allowed to testify to the facts depicted in the video, including key circumstantial evidence linking Pegs to the person loading the box with the missing game consoles. Jorgensen and Blaine both testified that in the video, they observed a man who was not an employee enter the locked store room that is limited to authorized personnel. That person selected a brown box with red tape and white label typically used for electronic merchandise, emptied that box of less expensive electronic items, and then filled that box with several expensive Nintendo DS game components. While filling the box, he periodically peeked out the window in the door and put his phone to his ear. Then he placed the filled box outside the storeroom door. The surveillance video revealed another man in the same area with a cart. Then both men walked out of the store with the electronics box in the cart without stopping at any register. Those two men were the only African American customers in the store at that time and were wearing the same clothes that Jorgensen saw Pegs and Ballou wearing while they were in the store, when leaving the store, and at the show-up.

Furthermore, Jorgensen testified about what he directly observed during the burglary. When he yelled at Pegs and Ballou to stop as they were exiting the store, they increased their speed. When he loudly told the 911 dispatch the license number of their car, they looked at him, together lifted the box from the cart and dropped it

12

into the trunk. Jorgensen heard a thud and saw the car suspension shift. Pegs and Ballou then drove away with Jorgensen running after them.

Taking the firsthand observations of Jorgensen at the store, together with Jorgensen and Blaine's descriptions of the contents of the surveillance video, there is overwhelming circumstantial evidence that Pegs was the individual in the storeroom loading the box later recovered from the Jaguar, and that Ballou was his accomplice. Whether viewed under the traditional harmless error rule that appears to apply to the admission of lay opinion testimony,[27] or under the more demanding constitutional harmless error standard,[28] we are convinced that the admission of the opinion testimony of Jorgensen, Blaine and Officer Gann identifying Pegs and Ballou as the individuals depicted on the videotape did not affect the verdict.

*Prior Bad Acts Testimony*

Pegs and Ballou both argue the trial court abused its discretion in allowing Jorgensen to testify that he had met Ballou in the past because it created an inference of prior bad acts, prohibited by ER 404(b). ER 404(b) prevents the admission of evidence of other crimes, wrongs, or acts "to prove the character of a person in order to show action in conformity therewith."[29] Before admitting ER 404(b) evidence, a trial court must "'(1) find by a preponderance of the evidence that the

---

[27] When evidence such as opinion testimony is improperly admitted, the trial court's error is harmless if it is minor in reference to the overall evidence as a whole. George, 150 Wn. App. at 119; State v Bourgeois, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997).

[28] Under the constitutional harmless error standard, we will not vacate the jury's finding if it appears beyond a reasonable doubt that the alleged error did not affect the verdict. State v. Monday, 171 Wn.2d 667, 680, 257 P.3d 551 (2011).

[29] State v. Foxhoven, 161 Wn.2d 168, 174-75, 163 P.3d 786 (2007).

misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect.'"[30]

The court ruled that although Jorgensen could testify he had met Ballou in the past, Jorgensen was not permitted to testify about the circumstances under which the two had met. The court also ruled that although identification of Ballou was not necessarily at issue, the testimony was relevant to Jorgensen's credibility and not overly prejudicial. At trial, Jorgensen testified as follows:

Q.    Had you met James Ballou in the past?

A.    Yes.[31]

Pegs and Ballou argue the testimony was improperly admitted because identity was not at issue, and even if it was, it allowed the jury to infer that Jorgensen had met Ballou because Ballou was a "criminal type." Pegs further argues that such an inference would prejudice him, i.e., because Ballou and Pegs were friends, Pegs must be guilty by association. The State responds the testimony itself does not meet the threshold of evidence of other crimes, wrongs or acts; rather, Jorgensen simply testified he had met Ballou before.

---

[30] Id. at 175 (quoting State v. Thang, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)). If the court decides to admit such evidence, a defendant is entitled to a limiting instruction only if he requests one. State v. Gresham, 173 Wn.2d 405, 424, 269 P.3d 207 (2012). The defendants did not request such an instruction.

[31] RP (Mar. 27, 2012) at 86.

The testimony did not constitute propensity evidence. But even if it did, the trial court's balancing analysis was appropriate. The State rightly points out that both defendants pleaded not guilty, putting identity at issue.[32] Because Jorgensen identified Ballou at the show-up and at trial, the fact that Jorgensen met Ballou was a "factor[ ] relating to that witness's credibility that the jury is charged to evaluate."[33] The trial court's ruling was consistent with ER 404(b). The trial court did not abuse its discretion.

### Jury Instruction on "Property"

Pegs and Ballou also argue the trial court erred in refusing to give the jury a proposed instruction defining "property" as meaning "anything of value."[34] The charge of burglary in the second degree required the State to prove Pegs and Ballou "with intent to commit a crime against a person or property therein, . . . enter[ed] or remain[ed] unlawfully in a building other than vehicle or a dwelling."[35] The prosecution argued they entered the store with the intent to commit the crime of theft. The court's instructions defined "theft" as "to take wrongfully the property of another with intent to deprive the owner of such property."[36]

---

[32] See Foxhoven, 161 Wn.2d at 178

[33] RP (Mar. 27, 2012) at 22.

[34] Clerk's Papers at 73.

[35] RCW 9A.52.030.

[36] Clerk's Papers at 44.

We review the adequacy of the jury instructions de novo "in the context of the instructions as a whole."[37] Jury instructions meet the requirements of a fair trial "if they are supported by substantial evidence, allow the parties to argue their theories of the case, and when read as a whole properly inform the jury of the applicable law."[38] Juries are presumed to follow the court's instructions.[39]

The State argued in closing that whether Pegs took the Nintendo DS consoles or just the box, either was sufficient to convict:

> So [the] State must prove beyond a reasonable doubt that Mr. Pegs entered that storage room with the intent to commit the crime of theft, to steal something. He did. DSs, he did. The box. It doesn't matter what it is. If he entered there to take one DS, that's the intent to commit the crime of theft. If he went in there to just take this box that he didn't have permission to take, and we know that, right, because nobody called the store to ask for permission to take a box, Mr. Jorgensen said he didn't give permission to either of these men to have this box, that's enough. They had the intent to go in that storage room and to commit theft.[40]

Pegs and Ballou contend the definitional instruction was necessary to respond to the prosecutor's argument that the intent to take an empty box was sufficient evidence of intent to commit theft, which would in turn support the burglary charge. They further contend they needed the instruction to argue the box had no value, and therefore was not property.

---

[37] State v. DeRyke, 149 Wn.2d 906, 910, 73 P.3d 1000 (2003); State v. Pirtle, 127 Wn.2d 628, 656, 904 P.2d 245 (1995).

[38] State v. Clausing, 147 Wn.2d 620, 626, 56 P.3d 550 (2002).

[39] State v. Johnson, 124 Wn.2d 57, 77, 873 P.2d 514 (1994).

[40] RP (Mar. 29, 2012) at 410-11.

Pegs' counsel's closing argument highlighted the testimony that the box had no value to Toys 'R Us:

> Theft is defined for you. It requires an intent to steal property. That's defined for you. It's the intent to deprive someone of their property. If there's no intent to deprive the store of their property, whether it's right or wrong, there's no burglary. If someone goes into a room and takes an empty box because they believe they're not depriving anyone of property that has any meaning because they give away this property, they throw out this property, they take in the back room and compact it, there's no intent to steal.[41]

Ballou's counsel's closing argument highlighted that the State had not found the DS game units Pegs had allegedly taken from the storeroom:

> The State's witnesses leave us with some questions. Like where did the DSs go?
>
> . . . .
>
> . . . The problem for the State is that their case conflicts with itself. Eyewitness testimony conflicts with the empty box found seven minutes after the 911 call. Nothing was stolen. There's no evidence a crime occurred. And really, floating the theory that if it was just a box it's a burglary? Really?[42]

With respect to the defense theory that the empty box was not property because it had no value, that theory is contrary to law. RCW 9A.04.110(22) provides a general definition of property criminal statutes: "'Property' means anything of value, whether tangible or intangible, real or personal."[43] RCW 9A.56.010(21) provides a definition of "value" that is specific to theft and robbery: "'Value' means the market value of the property or services at the time and in the approximate area of the

---

[41] RP (Mar. 29, 2012) at 448.

[42] RP (Mar. 29, 2012) at 440, 442.

[43] The definition of property as having anything of value may be useful in cases involving theft of intangible assets.

criminal act." RCW 9A.56.010(21)(e) further provides that "[p]roperty or services having value that cannot be ascertained pursuant to the standards set forth above shall be deemed to be of a value not exceeding two hundred and fifty dollars."

In State v. Tinker, our Supreme Court addressed these definitions in the context of a challenge to an information alleging third degree theft that had not specified the value of the property taken.[44] The court concluded that the information did not need to allege value to charge third degree theft, finding that "all items have some value under the statutory definition of value, . . . there is no threshold specification necessary to establish the very illegality of the behavior. The act of taking *any* item constitutes at least third degree theft."[45] Pegs and Ballou are entitled to instructions that allow them to argue their theory of the case, but they are not entitled to argue a theory of the case that is contrary to law.

With respect to the defense theory that taking only a box was not sufficient to show intent to commit theft, the instructions as given allowed Pegs and Ballou to argue that taking a cardboard box did not demonstrate intent to commit theft. They elicited testimony that Toys 'R Us would compact and discard its cardboard boxes, including the boxes containing electrical items. Because the store had the policy of discarding its boxes, Pegs and Ballou were free to argue, and in fact did argue, that taking such a box did not deprive the store of any of its property.[46] This defense

---

[44] 155 Wn.2d 219, 220-21, 118 P.3d 885 (2005).

[45] Id. at 222.

[46] The underlying concept that merely taking an empty box destined for disposal should not support an intent to steal the box is more likely grounded in concepts of abandonment, presumed consent, claim of right, good faith, or mistake, rather than the definition of "property." See generally 3 CHARLES E. TORCIA,

theory did not require the definitional instruction. We conclude the court did not err in refusing to instruct the jury on the definition of "property" as "anything of value."

Further, even if the court did err in failing to give the definitional instruction, any error is harmless. Under the constitutional harmless error standard,[47] we will not vacate the jury's finding if it appears beyond a reasonable doubt that the alleged error did not affect the verdict.[48] The State presented evidence that Pegs entered a restricted storeroom, put Nintendo DS game consoles in a cardboard box and placed the box outside the storeroom for Ballou. Ballou and Pegs pushed the shopping cart with the box out of the store, ignored the store manager's request that they stop, placed the box in the trunk of their car, and drove away. Even though police did not find the Nintendo DS game consoles during the search of the Jaguar, Jorgensen saw Pegs and Ballou lifting the box out of the cart together, heard a thud and saw the car

---

WHARTON'S CRIMINAL LAW 15TH ED. §§ 372 , 377 (1995) ("If an owner casts away property, intending no longer to have any interest therein, he is said to have 'abandoned' it. Abandoned property belongs to no one . . . [and] cannot be the subject of larceny."); see also 1 PAUL H. ROBINSON, CRIMINAL LAW DEFENSES §§ 66(b), 66(h), 109(c) (1984).

[47] To the extent Pegs and Ballou argue the court's refusal to instruct the jury on an element of the offense charged was error, the constitutional harmless error standard would apply. However, failure to further define a "commonly understood" element is not an error of constitutional magnitude. State v. Bledsoe, 33 Wn. App. 720, 727, 658 P.2d 674 (1983) (quoting State v. Pawling, 23 Wn. App. 226, 232-33, 597 P.2d 1367 (1979)). Under the nonconstitutional harmless error standard, reversal is required only if there is a reasonable probability that error materially affected the trial's outcome. State v. Ray, 116 Wn.2d 531, 546, 806 P.2d 1220 (1991) (quoting State v. Smith, 106 Wn.2d 772, 780, 725 P.2d 951 (1986)). As the note on use to Washington pattern jury instruction 2.21 provides, the definition of property should only be used when the term "may not be understood as applied to the facts of a particular case." 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS CRIMINAL 2.21, at 68 (3d ed. 2008).

[48] Monday, 171 Wn.2d at 680.

19

suspension shift when they dropped the box into the car trunk. And several game units were missing from the inventory taken immediately after the incident. In light of the strong evidence of a burglary, any error in refusing the instruction was harmless.

*Parenting Sentencing Alternative*

Pegs requested a sentence under the parenting sentencing alternative statute (PSA), RCW 9.94A.655. A community corrections officer evaluated Pegs and reported to the court that he was eligible for the alternative sentence. The court first noted that Pegs and Ballou "each have substantial criminal history."[49] The court recognized Pegs was eligible,[50] but declined to authorize the alternative sentence:

> Mr. Pegs, while you meet the statutory criteria for a parenting sentencing alternative, I will note that it is a new statute in the sense that it was passed into law in 2010, but I believe there were only 17 people in the entire state of Washington that have received a parenting sentencing alternative. It is an extraordinarily rare sentence to receive. The fact is I think reflective of some of the policy . . . to balance . . . the needs of accountability under the Sentencing Reform Act to the needs of an offender who has a young family and may in fact be the only parent available to parent . . . . Here I'm not finding a—well, I simply will not authorize a parent sentencing alternative sentence for you, Mr. Pegs.[51]

Pegs' sentence is stayed pending this appeal.

Pegs contends the court created additional criteria not present in the statute, and that the refusal to properly consider the PSA alternative was a failure to exercise

---

[49] RP (May 3, 2012) at 32.

[50] "An offender is eligible for the parenting sentencing alternative if: (a) The high end of the standard sentence range for the current offense is greater than one year [and] [t]he offender has physical custody of his or her minor child or is a legal guardian or custodian with physical custody of a child under the age of eighteen at the time of the current offense." RCW 9.94A.655(1)(a), (e).

[51] RP (May 3, 2012) at 33-34.

discretion. He notes that the statute does not say the sentence should only be given in extraordinary cases, nor does it say the offender must be the only parent or guardian of the child or children. Pegs relies upon State v. Grayson, where the Supreme Court held the trial court abused its discretion by refusing to give a drug offender sentencing alternative (DOSA) sentence where the principal reason was the judge's belief that there was inadequate funding to support the program, and where the court did not state on the record any other reason for its denial.[52] Pegs argues Grayson is analogous because here, the trial court found he was eligible but refused to give him the sentence based on the sole ground that the PSA was "extraordinarily rare," similar to the Grayson court's refusal to give the alternative because DOSA was underfunded.

Unlike Grayson, the court's rationale here was grounded in statutory considerations. In addition to the eligibility requirements set forth in RCW 9.94A.655(1)(a), subsection (4) expressly requires that the court "shall consider the offender's criminal history when determining if the alternative is appropriate." While the court acknowledged Pegs was eligible, the court also noted his substantial criminal history and then immediately referred to the need to balance accountability with the responsibilities of offenders with children. While the court did not explicitly state that its refusal to sentence Pegs under the PSA was due to his criminal history, the overall rationale expressed in the ruling does not constitute a categorical refusal to consider Pegs' request. We conclude the trial court did not refuse to exercise its

_____

[52] 154 Wn.2d 333, 342, 111 P.3d 1183 (2005).

discretion and did not abuse its discretion in declining to sentence Pegs under the PSA.

*Statement of Additional Grounds*

Ballou raises numerous additional grounds for review, but many overlap with the unsuccessful arguments made by his counsel. The issues surrounding the surveillance footage have been addressed above.[53]

Ballou also argues his trial should have been severed. A trial court's denial of a motion to sever is reviewed for manifest abuse of discretion.[54] To show that the trial court abused its discretion in denying severance, "the defendant must be able to point to specific prejudice."[55] A defendant seeking severance has "the burden of demonstrating that a trial involving all counts would be so manifestly prejudicial as to outweigh the concern for judicial economy."[56] Because the State charged Ballou based on accomplice liability, Ballou argues it was improper for him to be tried with Pegs. No abuse of discretion occurred because Ballou does not point to any specific prejudice. Nor could he likely point to any prejudice because Pegs' defenses—that Pegs took nothing of value from the storeroom and that the identification testimony based on the surveillance footage was inadmissible—were Ballou's defenses as well.

---

[53] Ballou suggests that the State's failure to secure the video violated a broad range of his rights, but all of his arguments fail because there is no showing the police acted in bad faith.

[54] State v. Medina, 112 Wn. App. 40, 52, 48 P.3d 1005 (2002).

[55] State v. Bythrow, 114 Wn.2d 713, 720, 790 P.2d 154 (1990).

[56] Id. at 718.

Ballou also challenges the sufficiency of the evidence. Viewing the evidence in a light most favorable to the State, as we must,[57] there is sufficient evidence of intent to commit theft and burglary.

Finally, Ballou advances arguments related to Officer Gann's stop of the Jaguar, including that the officer was outside his jurisdiction and lacked probable cause to stop him and Pegs. The record does not support either of these arguments.

Affirmed.

WE CONCUR:

---

[57] State v. Hosier, 157 Wn.2d 1, 8, 133 P.3d 936 (2006).