# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 72965-9-I |
| Appellant, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| THOMAS LEE OLSON, | ) | |
| Respondent. | ) | FILED: August 15, 2016 |
| | ) | |

APPELWICK, J. — Olson appeals his conviction and sentence for felony driving under the influence, driving while license suspended/revoked, and possession of a controlled substance. He asserts that his due process rights were violated when the State failed to prevent 911 call recordings from being automatically destroyed after he requested that they be preserved. He maintains that this behavior constituted governmental misconduct warranting reversal under CrR 8.3(b). For the first time on appeal, he contends that as applied to an indigent defendant, the statutes that require imposition of a mandatory deoxyribonucleic acid (DNA) fee and a victim penalty assessment (VPA) fee at sentencing violate substantive due process. We affirm.

## FACTS

On January 22, 2014, Officer Daniel Finan and Lieutenant Daniel Young responded to a report of a single vehicle traffic accident near the intersection of Lakemont Boulevard Southeast and Newport Way Southeast in Bellevue.

A witness, Marianne Jones, was at the scene. Jones had been driving northbound on Lakemont Boulevard behind the truck. Jones noticed the truck swerve into the opposite lane of traffic, and she called 911. Jones continued

following the truck. She could see that there was one person in the truck—the driver. She observed the truck swerve into a concrete barrier over a grass embankment, swerve again across oncoming traffic, drive up onto a sidewalk, and knock down a lamp post. She noticed that parts of the truck were falling off onto the road. She saw the truck stop before it reached the intersection. Jones saw the driver get out of the truck and begin picking up pieces of the truck that had fallen onto the road.

Joel Lessing also called 911 that day after witnessing the accident. Lessing was parked near the intersection when he saw a blue truck drive across all lanes of traffic, strike a guardrail, and grind to a halt before reaching the intersection. After the truck stopped, Lessing proceeded through the intersection toward the truck, rolled down his window, and asked the driver if he was okay.

When Lieutenant Young arrived, he saw someone sitting in the driver's seat of a heavily damaged pickup truck. When Officer Finan arrived on the scene, he observed a damaged blue pickup truck with its driver's side airbag deployed. A male individual was standing outside the driver's side door of the truck. Jones pointed toward the individual and told Officer Finan that he had been driving the truck. Officer Finan and Lieutenant Young approached the vehicle. The male individual identified himself as Thomas Olson. During the course of their contact with Olson, Officer Finan and Lieutenant Young saw drug paraphernalia in Olson's

2

sweatshirt. Olson admitted to smoking heroin about an hour earlier. Olson was arrested and read his Miranda[1] rights.

Olson told Officer Finan that a friend of his had been driving the truck and that Olson had been riding in the passenger seat. He said they had been following behind a friend driving another vehicle. Olson said the other car was driving erratically and caused the truck to crash. Olson stated that once the truck crashed, he and the driver of the truck got out, the driver got into the other friend's car, and those two drove away to get a tow truck for the truck. Olson told Lieutenant Young that he was waiting for the other driver to come back. Lieutenant Young remained on the scene for an hour and a half, and no one ever returned with a tow truck.

On January 29, 2014, the State charged Olson with felony driving while under the influence of or affected by intoxicating liquor or any drug (DUI) and driving while license suspended/revoked in the first degree. On January 30, 2014, an attorney appeared on behalf of Olson and entered a request for discovery. Among other things, Olson's attorney requested that the State preserve all physical evidence relating to the alleged offense, including, but not limited to 911 recordings until final disposition of the case or until further order of the court.

The Bellevue Police Department contracts with the North East King County Regional Public Safety Communication Agency (NORCOM), a company that handles dispatch and 911 calls. 911 NORCOM, http://www.norcom.org (last visited July 28, 2016). Pursuant to NORCOM's policy, the calls are retained for 90 days

---

[1] Miranda v. Arizona, 384 U.S. 436, 467-68, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

unless a preservation request is made. The State never provided the recordings to Olson, and the recordings were destroyed.

On September 19, 2014, the State amended the charges to include violation of the Uniformed Controlled Substances Act.[2] A jury found Olson guilty as charged. At sentencing, the court imposed $600 in LFOs—a $100 DNA fee and a $500 VPA fee. Olson appeals.

## DISCUSSION

Olson argues that this court should reverse, because his due process rights were violated when the 911 recordings were destroyed. He asserts that the State's failure to preserve the 911 recordings constituted "government mismanagement" of the case warranting reversal under CrR 8.3(b). For the first time on appeal, he claims that RCW 43.43.7541 and RCW 7.68.035—the statutes mandating the imposition of the $600 in LFOs—are unconstitutional as applied to defendants who do not have the ability or likely future ability to pay LFOs. And, he maintains that the LFO order should be stricken, because the trial court failed to comply with RCW 10.01.160(3) by not making an individualized inquiry into his ability to pay.

I. Due Process Violation

Olson argues that his right to due process was violated, because the State failed to preserve the 911 recording evidence after defense counsel made a proper discovery request.

---

[2] RCW 69.50.4013.

4

The government's failure to preserve evidence significant to the defense may violate a defendant's due process rights. State v. Wittenbarger, 124 Wn.2d 467, 475, 880 P.2d 517 (1994). Whether destruction of evidence constitutes a due process violation depends on the nature of the evidence and the motivation of law enforcement. State v. Groth, 163 Wn. App. 548, 557, 261 P.3d 183 (2011). If the State has failed to preserve "material exculpatory evidence," criminal charges must be dismissed. Wittenbarger, 124 Wn.2d at 475. In order to be considered "material exculpatory evidence," the evidence must both possess an exculpatory value that was apparent before it was destroyed and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. Id. at 475.

By contrast, the State's failure to preserve evidence that is merely "potentially useful" does not violate due process unless the defendant can show bad faith on the part of the State. State v. Burden, 104 Wn. App. 507, 512, 17 P.3d 1211 (2001). "Potentially useful" evidence is " 'evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.' " Groth, 163 Wn. App. at 557 (quoting Arizona v. Youngblood, 488 U.S. 51, 57, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988)). The presence or absence of bad faith must necessarily turn on the State's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed. Id. at 558. Thus, a defendant must show the destruction was improperly motivated. Id. at 559.

Here, neither the State nor the defense heard the tapes and neither knew of any exculpatory value. Olson concedes that the 911 recordings were only potentially useful to the defense. The disagreement between the parties stems from what constitutes a sufficient showing of bad faith and whether Olson has satisfied his burden. Specifically, the State claims that Olson has no evidence of improper motivation and that without that evidence, he cannot prove bad faith. By contrast, Olson asserts that he need not show improper motivation in order to show bad faith and that the State's reliance on Wittenbarger and Groth to support this proposition is misplaced.

In Wittenbarger, defendants moved to suppress evidence of a chemical breath analysis test based on the fact that the State failed to preserve maintenance and repair records for the breath test machines. 124 Wn.2d at 472. By not preserving the evidence, the State was adhering to new procedures and record keeping policies,[3] which did not require the preservation of the records. Id. at 477-78. Defendants argued that unlike a typical preservation of evidence case, the procedures themselves constituted a pattern of bad faith designed by the State to systematically deny defendants access to useful evidence. Id. at 477, 472. The defendants alleged that the State opted to no longer keep the records, because

---

[3] By statute, the State Toxicologist has the delegated authority to approve breath testing procedures and protocols. Wittenbarger, 124 Wn.2d at 472. The toxicologist drafted revised protocols and procedures for breath testing to reflect a switch to updated breath-testing technology. Id. Under the new quality assurance protocol, the State's record keeping policies changed. Id. at 473. Specifically, data from the inspections was no longer recorded and instead of recording information such as initial voltage values, adjusted voltage values, and calibration factors, the technicians merely indicated that the required tests were performed with satisfactory results by checking a box on the inspection forms. Id.

defense attorneys had used them successfully to challenge prosecutions in the past. Id. at 477.

The Wittenbarger court noted that the fact that the State was aware that defense counsel had found the old records useful did not lead it to conclude that the State acted in bad faith when it made the policy changes regarding record retention. Id. And, the court noted that the new procedures represented a good faith effort on the part of the State to verify that the machines were working and accurate. Id. at 478. It ultimately concluded that the defendants failed to convince it that the State's reduction in the amount of data retained from the results of the tests performed on the machine was improperly motivated. Id. Consequently, it declined to make a finding of bad faith. Id.

In Groth, Groth was convicted in 2009 for a murder that occurred in 1975. 163 Wn. App. at 551. In 1987, while the investigation was still pending, a sergeant ordered destruction of all of the physical evidence[4] from the crime scene except the murder weapon and crime scene photographs. Id. at 554. Groth argued that the destruction of the evidence constituted a violation of his due process rights. Id. at 556-57. The Groth court noted that it was unclear why the evidence was destroyed. Id. at 559. It ultimately concluded that there was no indication that the sheriff's office knew of any exculpatory aspect of the evidence or that the

_____

[4] A substantial amount of physical evidence was destroyed: plaster casts of footwear impressions, blood samples found at the crime scene, samples of the victim's clothing, blood, hair and fingernail scrapings from the autopsy, another suspect's boots and clothing from the night of the murder, any laboratory analyses, and the crime laboratory analyst's notes, reports, and conclusions concerning the forensic testing. Groth, 163 Wn. App. at 557-58, 553.

evidence's destruction in 1987 was improperly motivated. Id. It stated that to the extent any conclusions could be drawn from the record, it appeared that the sheriff's office negligently destroyed evidence of which any exculpatory value was not apparent. Id. It noted that the standard of bad faith required under Youngblood and Wittenbarger was, consequently, not met. Id.

Olson asserts that here, unlike in Wittenbarger, there is no allegation of systemic bias or an improperly motivated policy.[5] And, Olson argues that unlike in Groth, the government here had notice at the time the evidence was destroyed that the evidence was useful to the defense. Olson is correct. Neither case is dispositive in determining whether, factually, Olson has adequately shown bad faith exists here.

However, Wittenbarger stands for the proposition that a defendant must show that the destruction of the evidence was improperly motivated. See Wittenbarger, 124 Wn.2d at 478. And, the Groth court clearly announced that a showing of improper motivation is required. 163 Wn. App. at 559. Olson fails to support his argument that—although these cases are factually distinguishable—the general rule announced in these cases is inapplicable here. Thus, Olson must show that the destruction of the 911 recordings was improperly motivated in order to support the presence of bad faith. Id.

---

[5] We note that Olson is not alleging that the State has a policy of not responding to discovery requests, resulting in the automatic destruction of evidence.

We impute NORCOM's destruction of the 911 recordings to the State. The destruction of evidence here is serious given the State's obligation under CrR 4.7. We are troubled by the State's failure to comply with Olson's discovery request. The State should have complied with the discovery request, and it provides no meaningful explanation for its failure to do so. But, the question before us is whether the automatic destruction of potentially useful evidence, after a request for preservation, rises to the level of bad faith. While the facts may invite an inference of bad faith, they do not constitute affirmative evidence of improper motivation required by our case law.

Moreover, on these facts, any error in allowing the destruction of the evidence is harmless. See State v. Guloy, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985) (stating that it is well established that a constitutional error may be so insignificant as to be harmless); Youngblood, 488 U.S. at 59 (Stevens, J., concurring) (considering whether the defendant was prejudiced by lost evidence). An error of constitutional magnitude is harmless when the reviewing court is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in the absence of the error. Guloy, 104 Wn.2d at 425. Constitutional errors are presumed to be prejudicial and the State bears the burden of proving that the error was harmless. Id.

Olson's theory of the case at trial was that he was not the individual who was actually driving the truck, that someone else had driven the truck, and that the other person left the scene in another car. Olson asserts that any error here was

not harmless, because having access to the 911 recordings would have bolstered the defense's theory so as to establish reasonable doubt.

It is unclear from the computer-aided dispatch (CAD) log how many witnesses actually called 911 on the day of the incident. Below, Olson argued that as many as seven people called 911 to report the incident. The CAD log includes a list of seven "call persons." The list includes Jones, Cecily Novak, and five calls identified by telephone service providers that are not identified by number or name—one from Verizon, two from AT&T, and two from T-Mobile. In other places, the CAD lists incoming phone calls from callers by name, some by partial name, and some by telephone service provider. By name, it lists receiving calls from Clarissa Schaaf and Jones. It also identifies a call from "Joel"[6] and it lists an accompanying phone number. It is unclear from the CAD whether the "call persons" identified only by service providers were all separate callers. Either way, at least four separate callers were identified from the CAD log—Schaaf, Jones, Novak, and Lessing. At least three of the witnesses who called 911 testified at trial: Jones, Lessing, and Schaaf. The State did not list Novak as a witness.

Lessing spoke with the driver of the truck on the day of the incident, and he identified Olson as the driver at trial. Lessing testified that he saw no one else in the car and did not see anyone else at the scene. Jones also identified Olson. She testified that she could see there was only one person in the truck while it was moving and that she saw only one person get out of the truck. Schaaf testified that

---

[6] Joel's last name is Lessing.

10

she saw a light pole fall and saw a truck backing away from it. She testified that she saw the truck continue moving down the hill toward her. But, she testified that she was unable to see who was driving the vehicle or whether there were multiple people in the vehicle.

Still, Olson argues that the 911 calls had the potential of revealing that the eyewitness drivers were distracted. He asserts the recordings would have allowed him to impeach the eyewitnesses. This is purely speculative. He claims that if either of the witnesses was distracted for even 30 seconds, it would have supported his theory of the case that in the chaos, the actual driver left. But, the unavailability of the 911 recordings did not preclude Olson from presenting his theory of the case. He cross-examined the witnesses about their potential distractions. Olson's attorney highlighted that Jones was traveling with her children and was worried about their safety and the safety of a pedestrian. Olson's attorney highlighted that Lessing was on the phone with 911 while driving and that he never actually identified Olson from a lineup, and that he was not concentrating on what the driver looked like the day of the incident. On direct examination, Schaaf testified that it all happened very fast and that she was not paying attention. And, she stated that her young daughter was in the car at the time. Olson declined to cross-examine Schaaf. The jury had the opportunity to observe the witnesses' demeanor, weigh their answers, and judge their credibility.

And, during closing argument Olson's counsel reiterated that Jones was distracted. Counsel also argued that the State's eyewitnesses were generally

concerned with the safety of their passengers, other people on the scene, and that they had to navigate the intersection and pay attention during the critical moments. Counsel noted that the distractions meant that the witnesses did not have the ability to observe everything that occurred that day.

We conclude that any reasonable jury would have reached the same result even with the 911 recordings available. Therefore, we reject Olson's claim that the due process violation entitles him to reversal.

II.   CrR 8.3(b)

Also related to the State's failure to preserve the 911 recording evidence, Olson argues that the trial court erred when it did not dismiss the case due to "government mismanagement" of the case under CrR 8.3(b). CrR 8.3(b) states that the court may dismiss any criminal prosecution due to arbitrary action or governmental misconduct where there has been prejudice to the rights of the accused which materially affects the accused's right to a fair trial. This court reviews a trial court's denial of dismissal under CrR 8.3(b) for abuse of discretion. State v. Oppelt, 172 Wn.2d 285, 297, 257 P.3d 653 (2011).

Two things must be shown before a court can require dismissal of charges under CrR 8.3(b). State v. Michielli, 132 Wn.2d 229, 239, 937 P.2d 587 (1997). First, a defendant must show arbitrary action or governmental misconduct. Id. Governmental misconduct need not be of an evil or dishonest nature; simple mismanagement is sufficient. Id. at 239-40. Yet, Washington courts have clearly maintained that dismissal is an extraordinary remedy to which the court should

resort in only truly egregious cases of mismanagement or misconduct. State v. Wilson, 149 Wn.2d 1, 9, 65 P.3d 657 (2003). The second necessary element a defendant must show is prejudice affecting the defendant's right to a fair trial. Id.

An analysis under CrR 8.3(b) may well support a conclusion of governmental misconduct. But, because the same governmental conduct as viewed above through the lens of a constitutional violation is harmless, we conclude that Olson cannot establish prejudice sufficient to justify dismissal under this rule. Wilson, 149 Wn.2d at 9. Consequently, we hold that the trial court did not abuse its discretion when it denied Olson's CrR 8.3(b) motion to dismiss.

III.   LFOs

At sentencing, the trial court imposed $600 in mandatory LFOs—a $500 VPA fee and a $100 DNA fee. RCW 43.43.7541 and RCW 7.68.035[7] establish that the court's imposition of the DNA and VPA fees are mandatory. Specifically, RCW 7.68.035(1)(a) states that when a person is found guilty of having committed a crime, there "shall be imposed by the court upon such convicted person a penalty assessment." And, RCW 43.43.7541 states that "every sentence imposed . . . must include a fee of one hundred dollars."

For the first time on appeal, Olson argues that as applied to an indigent defendant, imposition of the mandatory VPA fee under RCW 7.68.035 and the mandatory DNA fee under RCW 43.43.7541 violates substantive due process.

---

[7] The legislature amended both of these statutes in 2015. See LAWS OF 2015, ch. 265 § 31; LAWS OF 2015, ch. 265 § 8. Because the salient portion of these statutes did not change and because the amendments do not affect this court's analysis, we refer to the current version of these statutes in this opinion.

The Washington Supreme Court considered and rejected a constitutional challenge to the imposition of the mandatory VPA fee under RCW 7.68.035(1) in State v. Curry, 118 Wn.2d 911, 917, 829 P.2d 166 (1992). The Curry court held that, generally, constitutional principles are implicated only when the State seeks to enforce collection of the mandatory assessment. Id. The court noted that imposition of the penalty assessment, standing alone, is not enough to raise constitutional concerns. Id. at 917 n.3.

And, we recently considered the ripeness of a defendant's as-applied substantive due process challenge to the imposition of the mandatory DNA fee in State v. Shelton, No. 72848-2-I, 2016 WL 3461164, at *1 (Wash. Ct. App. June 20, 2016). The Shelton court considered the same as-applied substantive due process challenge to the mandatory DNA fee statute. Id. at *2. We held that until the State attempts to enforce collection of the DNA fee or impose sanctions for failure to pay, the claim is not ripe for judicial review and is not an error of constitutional magnitude subject to review under RAP 2.5(a)(3).[8] Shelton, 2016 WL 3461164, at *6.

---

[8] Olson argues that the Washington Supreme Court already rejected the proposition that a challenge to the imposition of the DNA and VPA fees is not ripe until the State attempts to collect in State v. Blazina, 182 Wn.2d 827, 832, n.1, 344 P.3d 680 (2015). In Blazina, the court concluded that the defendant's challenge to the trial court's entry of an LFO order under RCW 10.01.160(3) was ripe for review at the time the order was imposed. 182 Wn.2d at 832 n.1. But, as recently noted by this court in Shelton, Blazina is distinguishable. 2016 WL 3461164, at *6. The Blazina court did not address the imposition of mandatory fees. Rather, it held only that RCW 10.01.160(3) requires the sentencing court to make an individualized inquiry into the defendant's ability to pay discretionary LFOs. 182 Wn.2d at 830. And, unlike discretionary LFOs, the legislature unequivocally requires—notwithstanding RCW 10.01.160(3)—imposition of the mandatory DNA

14

Olson argues that <u>Curry</u> is distinguishable. He argues that, unlike in <u>Curry</u>, rather than challenging the constitutionality of the LFO statutes based on the fundamental unfairness of their ultimate enforcement potential (incarceration), he is challenging the, "unconstitutional exercise of the State's regulatory power that is irrational when applied to defendants who have not been shown to have the ability to pay."

But, even if <u>Curry</u> is distinguishable in this regard, this court's recent pronouncement in <u>Shelton</u> is clear: an as-applied substantive due process challenge to the DNA fee statute is not ripe for review until the State attempts to enforce collection of the fee. <u>Shelton</u>, 2016 WL 3461164, at *6. And, there is nothing in <u>Shelton</u>'s reasoning that limits its application to only the mandatory DNA fee statute as opposed to also the mandatory VPA fee statute.

Still, Olson argues that his claim is ripe for review, because Washington's LFO scheme provides for immediate enforced collection processes, penalties, and sanctions through wage garnishment, payroll deduction, and the accrual of interest at the time of the entry of judgment. In other words, he implies that his claim is ripe, because the State may begin enforcing collection right away. But, Olson does not identify any evidence in his case indicating that the State has employed these or any enforcement mechanisms to collect the mandatory LFOs. In fact, the record shows that the trial court waived interest as to the $600 of LFOs in Olson's case.

---

fee and the mandatory VPA at sentencing without regard to the ability to pay. <u>See</u> RCW 43.43.7541; RCW 7.68.035; <u>Shelton</u>, 2016 WL 3461164, at *6.

15

We adhere to the decisions in <u>Curry</u> and <u>Shelton</u> and hold that Olson's as-applied substantive due process challenges to the mandatory DNA fee and VPA fee are not ripe for review and that they do not constitute manifest constitutional error warranting review for the first time on appeal.

We affirm.

WE CONCUR: