IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 33217-9-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| WILLIAM JOHN WRIGHT, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — William J. Wright appeals his convictions for one count

of possession with intent to deliver a controlled substance—methamphetamine, and four

counts of possession of a stolen vehicle. He argues the trial court erred in several

respects. His primary arguments challenge the veracity of the disclosed informant, the

adequacy of the affidavit in support of the search warrant, the particularity of the search

warrant, and the State's failure to preserve the recording of the informant's interview that

lead to the search warrant. We disagree with these and other arguments and affirm.

FACTS

A.    PREARREST FACTS

*Facts included in the affidavit for the search warrant*

On October 17, 2013, Deputy Jordan Bowman arrested Charles Castro in Newport, Washington, for an outstanding Department of Corrections warrant. Deputy Bowman advised Castro about the methamphetamine pipe and firearms he saw in Castro's truck. Castro responded that he had information about where methamphetamine was coming from in the Newport area and wanted to talk about it.

Deputy Bowman took Castro to the sheriff office's interview room, provided Castro his *Miranda*[1] warnings, and advised him that the interview was being video-audio recorded. Deputy Bowman later testified that unless one requested a copy of the recorded interview within 45 days, the system automatically recorded over the old interview.

Castro said he and a friend purchased methamphetamine from William Wright on or about October 14, that the three of them smoked the purchased methamphetamine in Wright's shop that day, and that Wright lived in an apartment above the shop. Castro provided specific details of the purchase, including that he went upstairs on the day of the purchase and saw Wright with a grapefruit sized rock of methamphetamine. Castro said

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Wright usually kept methamphetamine behind and to the right of a black recliner chair in the upstairs living room. Castro also said there is a cabinet behind the recliner where he had personally observed and handled a 7 mm rifle, a .45 caliber revolver, and a .30-06 rifle. Deputy Bowman's affidavit in support of probable cause noted that Wright was a convicted felon. Castro further stated there are always methamphetamine pipes, scales, and bindle "baggies" on the coffee table in the living room.

Castro said he had purchased methamphetamine from Wright for several years. Castro admitted he had a longtime methamphetamine addiction, but said he did not like to buy from Wright because Wright was a "predator." Clerk's Papers (CP) at 144. Castro admitted to having purchased methamphetamine from Wright six to seven times in the past 30 days.

Castro also described his observations of illegal activity on Wright's property. He said he had purchased and smoked methamphetamine in a trailer on Wright's property where Monty Radan and Ellen Dailey lived. He also said he had smoked methamphetamine at a remote location on Wright's property near a concrete slab. Castro, based on his belief that Wright walked to this remote location daily, thought Wright might keep his money at that location. Castro also described a vehicle junkyard 400 to 500 yards west of Wright's residence where he and Wright would shoot guns and

smoke methamphetamine. Castro believed that drugs and firearms might be stored in the junkyard.

Castro also mentioned another location, 50 to 75 yards north of Wright's residence, where a stolen Dodge pickup was possibly located. Castro said he overheard a conversation between Wright and Justin Ackaret about replacing an ignition on the stolen pickup.

In the affidavit in support of the search warrant, Deputy Bowman partially corroborated the information provided by Castro. Deputy Bowman noted that law enforcement arrested Ackaret on Wright's property five or six months before. He also noted that Ackaret had multiple felony convictions, including two convictions for possession of a stolen vehicle, and had a history of stealing Dodge pickups.

Also in the affidavit, Deputy Bowman disclosed that Castro has six felony convictions: two counts of possession of a stolen vehicle, two counts of possession of a controlled substance, and an attempt to elude, all from 2012; and a separate conviction for possession of a stolen vehicle in 2011.

*Scope of the search warrant*

A judicial officer reviewed the affidavit and then issued a search warrant. The warrant granted authorization to search, among other things, four contiguous parcels belonging to Wright, one of which had his shop and residence on it, one of which had a

4

trailer on it, and two of which contained no buildings. The warrant authorized officers to search for a white mid-90s Dodge Ram pickup, all firearms including but not limited to a .45 caliber revolver, a 7 mm rifle, a .30-06 rifle, and all other things by means of which the crimes of manufacturing, delivering, or possessing a controlled substance have or reasonably appear to have been committed.

*Execution of the search warrant and items found*

Deputies knocked and announced their presence at Wright's shop. A male's voice from inside the shop said "'[j]ust a minute.'" Report of Proceedings (RP) at 165. The deputies heard furtive movement in the upstairs portion of the shop. After nearly two minutes, deputies pried open the door and found Wright and three others in the shop.

Deputies found a small amount of methamphetamine, two small digital scales with methamphetamine residue, 75 hydrocodone pills in separate unlabeled bottles, $230 in cash, and hundreds of small unused sealable 1-inch by 1-inch bindle baggies with designs on them. Drug dealers often use small bindle baggies to distribute illegal drugs, including methamphetamine. Many of the baggies bore a red smiley face.

Deputies also searched the travel trailer in which Radan and Dailey lived. Both residents gave consent to search. Deputies found a drug kit with Dailey's name on it and two firearms. The drug kit contained drug paraphernalia and a single used bindle baggie with a red smiley face, just like those found in Wright's residence. The firearms

5

belonged to Radan. Elsewhere on Wright's property, the deputies found three stolen vehicles and a stolen all-terrain vehicle.

B.    POST ARREST FACTS BEFORE TRIAL

The State charged Wright with one count of possession with intent to deliver a controlled substance—methamphetamine, one count of possession with intent to deliver a controlled substance—hydrocodone, and four counts of possession of a stolen vehicle.

In December 2013, defense counsel sought a copy of the recording of Castro's video-audio interview. However, the recording no longer existed because no one had requested a copy within 45 days.

On March 17, 2014, defense counsel interviewed Castro. The purpose of the interview was to question Castro about the information he gave Deputy Bowman that led to the search warrant. Through this interview, defense counsel learned of information Castro told Deputy Bowman that was not included in his affidavit. For instance, Castro told Deputy Bowman that he wanted to do heinous things to Wright because Wright was a pedophile, gave drug cocktails to women, and fried the mind of his child's mother. In addition, Castro told Deputy Bowman that his dislike for Wright was so intense that he considered shooting him, that he was out for vigilante justice, and that revenge was one of his reasons for providing information that could lead to Wright going to jail.

Castro provided defense counsel information that was different from what was in Deputy Bowman's affidavit. The different information, however, was not exculpatory; rather, it generally consisted of how often and when Castro had purchased methamphetamine from Wright.

Prior to trial, Wright requested a *Franks*[2] hearing. Wright argued that Deputy Bowman intentionally omitted information about Castro's hatred toward Wright in the warrant affidavit. In denying Wright's request for a *Franks* hearing, the trial court determined that Wright failed to make the required showing that Deputy Bowman's omissions were material and were intended to mislead or deceive the judicial officer who signed the warrant. The trial court found that the omissions were not material because it would be reasonable to presume that Castro had an ulterior motive for sharing unfavorable information about Wright with law enforcement.

Wright later filed a motion to suppress the evidence obtained from the search warrant. Wright argued that the search warrant was deficient because it failed the *Aguilar/Spinelli*[3] test. The trial court denied the motion, and found that Castro had met the basis of knowledge and veracity prongs of the *Aguilar/Spinelli* test. The knowledge

---

[2] *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978).

[3] *Aguilar v. Texas*, 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964); *Spinelli v. United States*, 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969), *abrogated by Illinois v. Gates*, 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983), *but adhered to by State v. Jackson*, 102 Wn.2d 432, 688 P.2d 136 (1984).

prong was satisfied by: (1) Castro's personal observations of methamphetamine being sold and possessed by Wright, (2) Castro's own purchase of methamphetamine from Wright in the recent past and over the last few years, (3) Castro's shooting of firearms with Wright, (4) Castro's observations of firearms in Wright's residence, (5) Castro's overhearing a conversation between Wright and a known car thief about a stolen 1990s Dodge pickup truck, and (6) Castro's observations of abandoned vehicles on Wright's property. The veracity prong was satisfied by: (1) Castro's numerous statements against his penal interests—including his use, purchase, and possession of illegal drugs, and his illegal use and possession of firearms; (2) Castro's willingness to allow himself to be fully identified and to forgo a confidential status; (3) Castro's detailed knowledge of the layout of Wright's property; and (4) law enforcement's ability to corroborate some of Castro's information.

Wright also moved to dismiss the charges on the basis that law enforcement violated his due process rights when it failed to preserve Castro's recorded interview. The trial court conducted an evidentiary hearing and heard from witnesses including Deputy Bowman. In addition, the trial court compared the transcript of defense counsel's March 17, 2014 interview of Castro with Deputy Bowman's search warrant affidavit. The trial court found that Castro's omitted statements were not exculpatory. The trial court also found that the omitted statements were not inconsistent with the statements

8

contained in the search warrant affidavit. In particular, the affidavit's reference to Wright

as a "predator" was consistent with Castro's omitted statements that Wright was a

pedophile, a rapist, and had wronged "[Castro's] mama's babies." CP at 313. The trial

court further found that Castro's statements to defense counsel supplied defense counsel

"considerably more detail than the [unpreserved] recorded interview with Deputy

Bowman." *Id.* Finally, the trial court found that Deputy Bowman's failure to request a

copy of the recorded interview was not due to a desire to cover up any statement by

Castro in the interview. Rather, it was because Deputy Bowman did not believe he

needed a copy of the recording. Based upon these findings, the trial court denied

Wright's motion to dismiss the charges.

C.    OBJECTIONS DURING TRIAL

The case went to trial on January 20, 2015. Deputy Dan Dice testified that law

enforcement found firearms inside the trailer where Radan and Dailey lived. The State

also sought to admit a picture of the single used red smiley face bindle baggie found in

Dailey's drug kit. Wright objected based on relevancy. The trial court determined that

the baggie has some relevance and overruled the objection.

During closing argument, the State began discussing Castro's criminal history.

Wright objected on the basis that the State was improperly vouching for Castro. The trial

court did not rule on the objection but said it would "bear that in mind." Report of

9

Proceedings (RP) at 767. Wright argued in closing that the State would make a "bargain with the devil." RP at 781. In rebuttal, the State again began to discuss Castro's criminal history. Wright again raised a vouching objection. The trial court overruled the objection. The State then admitted that it made a deal with Castro and said, "the deal was worth it." RP at 802. Wright again objected. The trial court partially sustained the objection by instructing the jury to disregard the last part of the State's comment.

After the jury left to deliberate, Wright moved for a mistrial based on vouching. The trial court noted that no vouching had occurred until the ambiguous final comment and ultimately concluded that not even the final comment was vouching. The trial court denied Wright's motion for mistrial.

The jury found Wright guilty of possession of a controlled substance with intent to deliver—methamphetamine, and four counts of possession of a stolen motor vehicle. In addition to a lengthy sentence and community service, the trial court imposed mandatory and discretionary legal financial obligations (LFOs). Wright appealed.

## ANALYSIS

### A. DENIAL OF *FRANKS* HEARING

Wright argues the trial court erred when it denied his request for a *Franks* hearing to challenge the search warrant affidavit. Wright contends law enforcement intentionally or recklessly omitted the material statements from Castro to minimize Castro's hatred

10

toward him. Wright further contends, if those statements had been included in the search warrant affidavit, they would have negated probable cause and all evidence would have been suppressed.

This court reviews denial of a *Franks* hearing for an abuse of discretion. *State v. Wolken*, 103 Wn.2d 823, 829-30, 700 P.2d 319 (1985). Under the Fourth Amendment to the United States Constitution, omissions in a warrant affidavit may invalidate the warrant if the defendant establishes that they are material and made in reckless disregard for the truth. *Franks*, 438 U.S. at 155-56; *State v. Cord*, 103 Wn.2d 361, 366-67, 693 P.2d 81 (1985).

A defendant challenging a warrant on this basis is entitled to a *Franks* hearing if he makes a substantial preliminary showing of the materiality of the omissions. *Franks*, 438 U.S. at 155-56. An omission is material if it was necessary to the finding of probable cause. *State v. Copeland*, 130 Wn.2d 244, 277, 922 P.2d 1304 (1996).

An affiant's mere negligence or inadvertence is insufficient. *Franks*, 438 U.S. at 171; *State v. Seagull*, 95 Wn.2d 898, 908, 632 P.2d 44 (1981). "Recklessness may be shown by establishing that the affiant actually entertained serious doubts about the informant's veracity. 'Serious doubts' may be inferred from either (a) an affiant's actual deliberation or (b) the existence of obvious reasons to doubt the informant's veracity or

11

the information provided." *State v. Chenoweth*, 160 Wn.2d 454, 479, 158 P.3d 595 (2007) (citations omitted).

If the defendant makes a substantial preliminary showing, the test for probable cause when the affiant omits information is whether the affidavit remains sufficient to support a finding of probable cause when the omitted information is inserted. *State v. Atchley*, 142 Wn. App. 147, 158, 173 P.3d 323 (2007). If the affidavit supports probable cause even when the omitted information is inserted, the suppression motion fails and no hearing is required. *Id.*

First, Wright fails to explain how the omission was material in finding probable cause. The trial court presumed that an informant typically has a motive to provide information to law enforcement. Here, Castro's motivation was revenge against Wright for the bad things he had done, most of which involved selling methamphetamine to others. Inclusion of the omitted information—Castro wanting to do heinous things to Wright because Wright was a pedophile, gave drug cocktails to women, and fried the mind of his child's mother—would only strengthen probable cause.

Second, law enforcement did not omit information of Castro's dislike for Wright. The affidavit states that Castro "did not usually like to buy from [Wright], because he was a predator." CP at 144. Calling a person a predator has obvious and strong implications of dislike. The level of detail in the affidavit is certainly less than that given

12

in Castro's transcribed interview with defense counsel. However, because the affidavit called Wright a predator, any judicial officer reviewing it could infer that Castro disliked Wright.

Finally, inclusion of the omitted information does not detract from probable cause to issue the search warrant. Castro admitted he hated Wright and wanted to shoot him. Castro stated, "I wanted to do some heinous stuff to [Wright], but I didn't." CP at 100. Castro also explained his motive for informing on Wright:

> [Castro:] I wanted to get vigilante justice, now I [just] want justice. I want to put him in prison where he belongs.
>
> . . . .
>
> . . . It wasn't—it's not that I'm trying to get even with the dude; it's what needs to be done. He needs to be put into prison.
>
> . . . .
>
> . . . I told the police that where my head was at that I was going to shoot him. That's what I told them. But I didn't so.

CP at 103. Castro later clarified:

> . . . I don't want to get even with Mr. Wright; I want to put him in prison for what he has done.
>
> . . . .
>
> . . . He sells methamphetamine to the community and its killing everybody and including myself.

CP at 105. Although Castro wanted to do heinous things to Wright, his desire to do such things was because Wright sold methamphetamine to the community and

methamphetamine was killing people. Inclusion of the omitted information does not detract from probable cause, it adds to probable cause.

We conclude the trial court did not abuse its discretion when it denied Wright's request for a *Franks* hearing.

B.    SUFFICIENCY OF SEARCH WARRANT

Wright next argues the trial court erred when it denied his motion to suppress. Wright claims that neither prong of the *Aguilar/Spinelli* test was met, and the search warrant lacked particularity. We disagree.

When reviewing the denial of a motion to suppress, this court must determine whether substantial evidence supports the trial court's findings and, in turn, whether those findings support the conclusions of law. *State v. Russell*, 180 Wn.2d 860, 866, 330 P.3d 151 (2014). Unchallenged findings of fact are verities on appeal. *State v. Ross*, 141 Wn.2d 304, 309, 4 P.3d 130 (2000). Probable cause to issue a warrant is established if the supporting affidavit sets forth "facts sufficient for a reasonable person to conclude the defendant probably is involved in criminal activity." *State v. Huft*, 106 Wn.2d 206, 209, 720 P.2d 838 (1986). This court tests the affidavit in a commonsense rather than hyper-technical manner. *State v. Jackson*, 150 Wn.2d 251, 265, 76 P.3d 217 (2003). The existence of probable cause is a legal question that a reviewing court reviews de novo. *State v. Chamberlin*, 161 Wn.2d 30, 40, 162 P.3d 389 (2007). However, we afford great

14

deference to the issuing magistrate's determination of probable cause. *Cord*, 103 Wn.2d at 366.

### 1. Aguilar-Spinelli *test*

Under circumstances where an informant's tips lead to the issuance of a search warrant, Washington follows the *Aguilar/Spinelli* test requiring that the affidavit must demonstrate the informant's (1) basis of knowledge and (2) veracity. *State v. Vickers*, 148 Wn.2d 91, 112, 59 P.3d 58 (2002).

### a. *Basis of knowledge*

An informant's personal knowledge and detailed observations support the basis of knowledge. *Wolken*, 103 Wn.2d at 827. If the informant's information is hearsay, the basis of knowledge prong can be satisfied if there is sufficient information so that the hearsay establishes a basis of knowledge. *Jackson*, 102 Wn.2d at 437-38.

The search warrant affidavit established that Castro had direct knowledge of Wright's illegal activities involving the sale of methamphetamine, the possession of firearms, and the possession of stolen vehicles. Castro stated he had purchased methamphetamine from Wright for years and multiple times in the past 30 days. He gave details about his personal observations of methamphetamine, methamphetamine use, and drug paraphernalia both inside Wright's residence and on his property. He also described

the precise location and type of firearms he saw inside Wright's residence and how he and Wright shot firearms at various locations on Wright's property.

Castro also related a conversation he personally overheard between Wright and Ackaret about a stolen Dodge pickup truck. Deputy Bowman was able to corroborate Castro's statement because he knew law enforcement recently arrested Ackaret on Wright's property and he knew Ackaret stole Dodge pickups.

b. *Veracity*

Named informants are a strong indicator of reliability. *Chenoweth*, 160 Wn.2d at 483. A showing of reliability is relaxed when the search warrant discloses the identity of the informant to the reviewing magistrate. *State v. Gaddy*, 152 Wn.2d 64, 72-73, 93 P.3d 872 (2004). Willingness to provide an address and police interview are additional circumstances supporting reliability. *Chenoweth*, 160 Wn.2d at 483. "Statements against penal interest are intrinsically reliable because a person is unlikely to make a self-incriminating admission unless it is true." *Id.* A strong motive to be truthful such as seeking a deal with law enforcement is also an indicator of reliability. *State v. Bean*, 89 Wn.2d 467, 471, 572 P.2d 1102 (1978).

As discussed above, the search warrant affidavit established Castro's veracity. In addition, Castro was an openly named informant who agreed to give a recorded interview

16

with law enforcement. Castro also made numerous statements against his penal interest in the interview.

Wright again argues that Castro had ulterior motives for providing information to law enforcement, such as revenge. But as explained above, Castro's desire to provide information to law enforcement was because he knew Wright sold methamphetamine to people. Such motivation only adds to Castro's veracity.

### 2.    *Particularity requirement*

A search warrant may be issued only if the affidavit shows probable cause. *State v. Thein*, 138 Wn.2d 133, 140, 977 P.2d 582 (1999). Probable cause exists where the search warrant affidavit sets forth "facts and circumstances sufficient to establish a reasonable inference that the defendant is involved in criminal activity and that evidence of the criminal activity can be found at the place to be searched." *State v. Maddox*, 152 Wn.2d 499, 505, 98 P.3d 1199 (2004). Accordingly, "'probable cause requires a nexus between [the] criminal activity and the item to be seized, and also a nexus between the item to be seized and the place to be searched.'" *Thein*, 138 Wn.2d at 140 (quoting *State v. Goble*, 88 Wn. App. 503, 509, 945 P.2d 263 (1997)). For drug crimes, this nexus between criminal activity and the place to be searched requires more than a showing that the suspect is probably involved in drug dealing and resides at the place to be searched. *Id.* at 141. Rather, the probable cause standard requires specific facts from which to

17

conclude evidence of illegal activity will likely be found at the place to be searched. *Id.* at 147. A warrant must also be sufficiently definite so that an officer executing the warrant can identify the property with reasonable certainty. *State v. Stenson*, 132 Wn.2d 668, 691-92, 940 P.2d 1239 (1997). If "the precise identity of items sought cannot be determined when the warrant is issued, a generic or general description of items will be sufficient if probable cause is shown and a more specific description is impossible." *Id.* This court reviews warrants describing physical objects with less scrutiny. *State v. Chambers*, 88 Wn. App. 640, 644, 945 P.2d 1172 (1997).

Deputy Bowman's search warrant affidavit is replete with specific facts that establish a nexus between the items to be seized, places to be searched, and criminal activity. As discussed above, the affidavit established that Wright had sold and used methamphetamine in his residence and at numerous specific locations on his property outside of his own residence. The affidavit notes that Castro had purchased methamphetamine from Wright for years, and several times in the 30 days preceding Castro's interview. Castro described methamphetamine and drug paraphernalia as always being present in Wright's living room, and Wright recently handling a grapefruit sized ball of methamphetamine. The affidavit also described Castro saw and handled numerous firearms possessed by Wright in his living room near a black recliner chair.

18

The affidavit also described a conversation between Wright and a second man concerning a stolen white Dodge pickup. Deputy Bowman knew the second man, knew law enforcement recently arrested that man on Wright's property, and knew that man had a record of stealing Dodge pickups. Castro's statement concerning the stolen pickup, corroborated by information known to Deputy Bowman, provided sufficient probable cause to search Wright's property for the Dodge pickup.

We conclude that the *Aguilar/Spinelli* test is satisfied, that a nexus exists between the items to be seized, places to be searched, and criminal activity, and that the search warrant meets the particularity requirement.

C.    MOTION TO DISMISS—DESTRUCTION OF EVIDENCE

Wright next contends the trial court erred in denying his motion to dismiss for destruction of evidence. Wright argues the State destroyed Castro's recorded police interview, which was material and exculpatory evidence. In the alternative, he argues the recorded interview was potentially useful evidence that the State destroyed in bad faith. We disagree.

Due process requires the State to preserve material exculpatory evidence, or courts must dismiss a defendant's criminal charges. *State v. Groth*, 163 Wn. App. 548, 557, 261 P.3d 183 (2011). An alleged due process violation is subject to de novo review. *State v. Eckblad*, 152 Wn.2d 515, 518, 98 P.3d 1184 (2004). Material exculpatory evidence is

19

evidence that: (1) possesses an exculpatory value apparent before its destruction, and (2) the defendant is unable to obtain comparable evidence by other reasonably available means. *Groth*, 163 Wn. App. at 557 (quoting *State v. Wittenbarger*, 124 Wn.2d 467, 475, 880 P.2d 517 (1994)). Destroyed evidence that does not meet both parts of the test is instead potentially useful evidence, and no due process violation occurs unless the defendant can show bad faith by the police. *Id.* Bad faith turns on whether the police knew the exculpatory value of the evidence at the time it was destroyed or lost. *Id.* at 558-59. A defendant must therefore show that the destruction was improperly motivated. *Id.* at 559. Unchallenged findings of fact are verities on appeal. *Robel v. Roundup Corp.*, 148 Wn.2d 35, 42, 59 P.3d 611 (2002).

### 1. *The recording was not material or exculpatory*

The recording was not material or exculpatory. The recording was not material because defense counsel could obtain substantially the same information, or more, by personally interviewing Castro. As found by the trial court, defense counsel actually obtained more detailed information than likely was obtained by Deputy Bowman.

Nor was the recording exculpatory. There is no evidence that Castro provided information to Deputy Bowman that could be helpful to Wright. To the contrary. The evidence omitted from the deputy's affidavit actually provided greater probable cause for the search warrant. At most, the recording was potentially useful evidence.

20

2. *The State's failure to preserve the recording was not bad faith*

Wright cites the testimony of Deputy Bowman and Deputy Matt McKay as proof

of bad faith. Deputy McKay testified that law enforcement interviews of this nature are

recorded so that law enforcement can later request a copy. Deputy McKay also testified

that it would have been a better police practice to have preserved a recording. Wright's

reference to Deputy Bowman's testimony is similar. The trial court issued an order

denying Wright's motion to dismiss for destruction, and in finding of fact B described the

circumstances of the recording:

> Deputy Bowman did tell Mr. Castro he was being audio and video
> recorded. Deputy Bowman failed to request a copy of the interview
> recording, and it was automatically overridden after 45 days. He did not
> think he needed a copy. He was not trying to cover up any statements by
> Mr. Castro in the interview. Also, Deputy Bowman did not request that the
> interview recording be altered or destroyed prior to the 45 day override.

CP at 311. Wright does not specifically challenge the finding that Deputy Bowman did

not think a copy of the tape was necessary. Instead, he simply asserts that bad faith exists

because both deputies admitted that the better police practice would have been to request

a copy of the recording. However, the exculpatory value of the tape, if any, was not

apparent. Wright does not persuade us that the trial court's finding that Deputy Bowman

did not think a copy of the recording was necessary. We therefore decline to overturn

21

this finding. Because the exculpatory value of the recording was not apparent to

Bowman, Wright has failed to establish bad faith.

D.    TRIAL COURT'S DISCRETIONARY ADMISSION OF BAGGIE NOT IMPROPER

Wright next contends that the trial court erred when it admitted Deputy Dan

Dice's testimony about the firearms and the smiley face baggies found inside Radan and

Dailey's trailer. Wright contends the evidence was irrelevant.

The determination of relevance is within the broad discretion of the trial court and

will not be disturbed absent a manifest abuse of discretion. *State v. Swan*, 114 Wn.2d

613, 658, 790 P.2d 610 (1990). "Abuse exists when the trial court's exercise of

discretion is 'manifestly unreasonable or based upon untenable grounds or reasons.'"

*State v. Darden*, 145 Wn.2d 612, 619, 41 P.3d 1189 (2002) (quoting *State v. Powell*, 126

Wn.2d 244, 258, 893 P.2d 615 (1995)).

Generally, all relevant evidence is admissible and all irrelevant evidence is

inadmissible. ER 402. "Relevant evidence" is any "evidence having any tendency to

make the existence of any fact that is of consequence to the determination of the action

more probable or less probable than it would be without the evidence." ER 401. "The

threshold to admit relevant evidence is very low. Even minimally relevant evidence is

admissible." *Darden*, 145 Wn.2d at 621. A party must object at trial to preserve this

issue for review.  RAP 2.5(a); *State v. Perez-Cervantes*, 141 Wn.2d 468, 482, 6 P.3d 1160 (2000).

Wright did not object to Deputy Rice's testimony about the firearms found inside the trailer.  Because Wright did not preserve this issue for review, we decline to address it.

The State sought to have a photograph of the used bindle baggie found inside Dailey's drug kit admitted.  The trial court permitted Wright to ask questions of Deputy Dice in aid of a potential objection.  Deputy Dice admitted to Wright there was no evidence the used baggie belonged to him.  Wright then objected based on relevance, and stated that baggies with smiley faces are mass-produced.  The State noted that the used baggie with the smiley face was identical to the baggies with smiley faces found in Wright's residence.  The trial court determined that the similarity between the baggies made the photograph somewhat relevant and overruled Wright's objection.  We agree.

Here, the State charged Wright with possession with intent to deliver— methamphetamine.  A reasonable juror could find the delivery aspect of the charge more likely proved by the fact that the used smiley face baggie in Dailey's drug kit was the same as the baggies found in Wright's residence.  We find no abuse of discretion.

E.   MOTION FOR MISTRIAL—NO PROSECUTORIAL MISCONDUCT

Wright next contends the State engaged in prosecutorial misconduct during closing argument and reversal is required. Here, Wright preserved the issue of prosecutorial misconduct by objecting during the State's closing arguments and by moving for a mistrial after the parties concluded oral arguments.

A prosecutorial misconduct inquiry consists of two prongs: (1) whether the prosecutor's comments were improper and (2) if so, whether the improper comments caused prejudice. *State v. Warren*, 165 Wn.2d 17, 26, 195 P.3d 940 (2008). We review a trial court's rulings of whether prosecutorial conduct occurred or not for an abuse of discretion. *State v. Lindsay*, 180 Wn.2d 423, 430, 326 P.3d 125 (2014).

### 1.   First prong: The prosecutor's first two statements were not improper

Wright contends the State improperly vouched for Castro during closing argument.

> Improper vouching occurs when the prosecutor expresses a personal belief in the veracity of a witness or indicates that evidence not presented at trial supports the testimony of a witness. Whether a witness testifies truthfully is an issue entirely within the province of the trier of fact.

*State v. Thorgerson*, 172 Wn.2d 438, 443, 258 P.3d 43 (2011) (citation omitted).

The allegation of improper vouching concerns the State's discussion of Castro's criminal history and the deal the State made with Castro. Wright's first and second

24

objections came when the State discussed Castro's criminal history. Castro's criminal

history was a fact in the case; it was not the prosecutor's personal belief of Castro's

believability. The trial court did not err when it permitted such argument.

In Wright's closing argument, he argued Castro made a deal with the devil. In

rebuttal, the State argued:

> [State]: As the evidence showed, we made a deal with Mr. Castro.
> After looking at all those things, I made a deal with Mr. Castro. In looking
> at his criminal history and looking [at] what he was charged with and
> looking at the multiple felonies and looking at what he was potentially
> facing, and then we looked at Mr. Wright and I made a deal with Mr.
> Castro. And the deal was worth it. I would ask that all of you—
> [Defense counsel]: Your Honor, that's vouching.
> THE COURT: I'll ask the jury to disregard the last comment . . . .

RP at 802. After rebuttal, the jury left to deliberate. Wright promptly made a motion for

mistrial based on the above three comments. The trial court denied the motion, and

reasoned:

> Well, Counsel, the Court overruled two objections prior to the third and
> indicated that there was no vouching, and there was none. . . . The only aberration
> was at the very end there where it was worth it, or words to those—that effect by
> [the State], but that language I did direct the jury to disregard.
> I think it's an ambiguous comment. I think it was meant to be a response to
> the defense, and a response in the sense that the—this is a common police
> investigative tactic, this is a common position for this kind of trial to be in at the
> end, namely arguing over the credibility of a witness, but [the State] was careful to
> not say anything directly about the believability, if you will, of Mr. Castro
> according to his own personal belief. That's not what I heard him say. I heard
> him say that this agreement overall was part of traditional and everyday police
> procedure and that's what occurred. So that's how I see it. I did direct the jury to

25

disregard it. It was a brief comment and it came in the context, again, of absolutely no vouching at any time prior to this comment.

RP at 811-12. We agree with the trial court's assessment.

The State never vouched for the veracity of Castro. The State simply responded to Wright's argument about its deal with Castro. Those are facts that the jury already knew.

The only statement by the State that one might construe as improper vouching was the prosecutor's statement that the deal was worth it. We are uncertain whether that statement was improper vouching. Because we are uncertain, we conclude the trial court did not abuse its discretion in its assessment of that statement and in denying Wright's motion for a mistrial.

> 2.     *Second prong: The prosecutor's final statement was not prejudicial*

Although we need not address the second prong, we wish to provide an alternative basis to affirm the trial court's denial of Wright's motion for a mistrial.

To show prejudice, a defendant must show a substantial likelihood that the prosecutor's statement affected the jury's verdict. *Lindsay*, 180 Wn.2d at 440.

The prosecutor's statement is improper vouching only if one could reasonably construe the statement as the prosecutor's opinion that Castro was believable. Even if one so construed the statement, the trial court instructed the jury to disregard it. We presume the jury adheres to the trial court's instructions when the trial court instructs the

26

jury to disregard an improper question or argument. *Swan*, 114 Wn.2d at 661-62. Given this presumption, we conclude the questionable statement could not have affected the jury's verdict and, therefore, it was not prejudicial.

STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW: IMPOSITION OF LFOS NOT ERRONEOUS

In his statement of additional grounds for review, Wright argues the trial court erred by imposing mandatory and discretionary LFOs without performing an individualized inquiry into his current or future ability to pay. We disagree.

The trial court did engage in an individualized inquiry into Wright's current or future ability to pay. The trial court stated on the record that Wright probably had made substantial money by selling illegal drugs. The trial court also stated that Wright probably found his chosen business quite lucrative and benefitted financially despite the proceedings against him. The trial court was satisfied that Wright had the current ability to pay the assessed LFOs. Because the trial court's comments were based on the evidence presented at trial, we find no error.

27

No. 33217-9-III
*State v. Wright*

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____     _____
Fearing, C.J.                         Korsmo, J.

28