**FILED**
**JANUARY 29, 2026**
**In the Office of the Clerk of Court**
**WA State Court of Appeals, Division III**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 40732-2-III |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| BURK T. SIMONSON, | ) | |
| | ) | |
| Respondent. | ) | |

MURPHY, J. — The State of Washington appeals from the trial court's order dismissing the information charging Burk Simonson with possession of a stolen motor vehicle. Law enforcement located Simonson based, in part, on data from a "Flock Safety" (Flock) automated license plate reader (ALPR) system. Clerk's Papers (CP) at 70, 75-76. Simonson moved under CrR 3.6 to suppress all evidence obtained from use of the ALPR, arguing the data was obtained through an unlawful search and seizure. He also moved

under former CrR 8.3 (2008)[1] to dismiss the charge based on a failure by the State to preserve the ALPR data. After conducting an evidentiary hearing, the trial court ruled the missing data was potentially useful evidence and that the State failed to preserve it. Without this evidence, the trial court reasoned that it could not rule on whether the use of the ALPR system constituted an unlawful search. The trial court did, however, dismiss the charge under former CrR 8.3(b) for failure to preserve evidence.

The State appeals, arguing (1) the trial court did not find the State acted in bad faith and thus erred in dismissing the case as a matter of law, (2) Simonson failed to provide sufficient evidence to support a finding of bad faith, and (3) the trial court improperly shifted the burden to the State to establish good faith.

Simonson disagrees and argues, alternatively, that the record supports dismissal based on governmental misconduct for failure to retain evidence and failure under CrR 4.7 to comply with discovery requests.

The trial court did not find the State acted in bad faith and abused its discretion in improperly shifting the burden to the State to prove good faith. We reverse the order dismissing the information and remand for further proceedings.

---

[1] CrR 8.3 was amended effective September 25, 2025, approximately one year after the trial court dismissed the information in Simonson's case.

FACTUAL BACKGROUND

The Spokane County Sheriff's Office, Liberty Lake Police Department, and Airway Heights Police Department use Flock ALPR cameras, known as "Falcon" cameras, that are affixed along public roadways. CP at 70. These motion-activated cameras capture still images of license plates on vehicles traveling on public roads, within an approximate 50-foot range. The images are sent to Flock servers that compare the plates against a database linked to the "FBI's National Crime Information Center (NCIC)." CP at 71. If a match occurs for a stolen vehicle or other interest, authorized users are notified of this through what is called a "hit." CP at 71. Users can set notification parameters, such as geographical locations or methods of communication (computer, e-mail, text). A "'hit'" serves as a "'pointer,'" with law enforcement still being required to verify the accuracy of the information against NCIC records. CP at 74. NCIC records are updated every four hours. The ALPR cameras do not track a vehicle's travel, but a vehicle's direction of travel may be inferred from still images.

When an ALPR camera takes a photograph and no "hit" results, the image is stored for 30 days in the Flock database, at which time it is deleted pursuant to Flock's internal data retention policy. However, if law enforcement obtains a digital image that captured an action from which a criminal prosecution is expected or likely, then State policy requires law enforcement to retain that information by archiving it. Separately,

3

any authorized user may query the data retained in the Flock system. Every query requires the user to specify the reason for the query. An audit log serves as a record of every database inquiry. The audit log is maintained indefinitely.

On May 31, 2024, Deputy Tyler[2] of the Spokane County Sheriff's Office responded to a report that a dark grey Ford F-150 pickup with Washington license plate D63272A had been stolen from a parking lot. Citing to police reports,[3] Simonson represented in submissions to the trial court that, prior to the events at issue, "multiple officers accessed the Flock system on multiple occasions," and at least three law enforcement personnel reported that "they used the Flock System during their investigation of this case."[4] CP at 43-44.

---

[2] The first name of Deputy Tyler, and several other law enforcement officers associated with this case, is not contained in the record on review.

[3] In its September 25, 2024, findings of fact and conclusions of law, the trial noted "that the defense presented the facts from the police reports as being relevant to their motions, but expressly denied that Mr. Simonson was admitting those facts as true. Although the full police reports were not provided with the materials, both sides made representations ostensibly from the police reports without the other side objecting or correcting the representations. Presumably, these are undisputed and are consistent with the Affidavit of Facts in the Court file." CP at 69 (footnotes omitted) (citing CP at 2-6).

[4] Simonson also represented that on June 13, 2024, Officer Matt McKay of the Liberty Lake Police Department responded to a vehicle prowl that occurred on June 11, 2024, and reviewed surveillance footage showed a gray Ford F-150, with Detective Bowman then checking the Flock camera system and locating a "gray [Ford] F-150" with license plate "D67297A." CP at 75.

On June 15, 2024, at approximately 4:14 a.m., Deputy Flanagan of the Spokane County Sheriff's Office received a Flock hit of a "stolen Washington license plate D20816D" in Airway Heights. CP at 3. Upon Deputy Flanagan's inspection of the photograph from the alert, "it appeared the license plate was displayed on a Ford pickup of an unknown color." CP at 3. When checking the area for the vehicle, Deputy Flanagan located the stolen license plate displayed on a Ford F-150, in the parking lot of the Kalispel Tribe's Northern Quest Casino. The registration revealed the license plate belonged to a different vehicle. The vehicle identification number (VIN) on the Ford F-150 was "covered with a receipt and a lottery ticket, in what appeared to be an attempt to conceal the VIN from outside view." CP at 4.

The Kalispel Tribal Police responded and assisted the Spokane County Sheriff's Office in making contact with Northern Quest Casino's Tribal Gaming Authority to review relevant surveillance footage. Through the surveillance footage, law enforcement identified Simonson as the sole occupant and driver of the Ford F-150. When contacted, Simonson claimed the truck was lent to him by his friend "John," although Simonson did not know John's last name. CP at 4. Simonson had the keys to the truck in his pocket and consented to opening the door so the VIN could be inspected. Law enforcement confirmed the truck was stolen and arrested Simonson. On June 21, 2024, the State charged Simonson with one count of possession of a stolen motor vehicle

5

On June 25, 2024, counsel for Simonson filed a notice of appearance and request for discovery, including but not limited to any: (1) "books, papers, documents, photographs, or tangible objects which might be introduced or otherwise used in any hearing or trial," (2) "information available to the State regarding electronic surveillance," (3) "data connected with this case that has been extracted from cell phones, laptops, computers, or other electronic devices," and (4) "video and audio recordings." CP at 182.

On August 2, 2024, defense counsel e-mailed the assigned prosecutor about discovery they believed to be missing and requested, among other items, "all of the [F]lock information, data and photos/videos . . . associated with the case." CP at 38-39. On August 8, the prosecutor responded that the Flock footage could not be obtained or produced because it had not been archived and it was past the 30-day retention policy, meaning any associated images were no longer available. The same day, Simonson's attorney responded: "With regard to the [F]lock information; even though the data was not preserved, I believe the system access history is stored indefinitely. Can you please send us the access history relevant to this case?" CP at 37. In follow-up e-mails several weeks later, the prosecutor informed defense counsel that they had contacted Deputy Flanagan, who deferred to Dustin Baunsgard (Baunsgard), interim supervisor of Spokane

County's Real Time Crime Center, on the requested Flock information. Ultimately,

the State produced the following Flock "hit" information to defense counsel:

| | |
|---|---|
| **From:** | hotlist=flocksafety.com@mail.flocksafety.com on behalf of Flock Hotlist Alerts <hotlist@flocksafety.com> |
| **Sent:** | Saturday, June 15, 2024 4:15 AM |
| **To:** | Baunsgard, Dustin |
| **Subject:** | HOTLIST ALERT: WA - D20816D #09 W 12th Ave WB @ S Deer Heights Rd |

## WA - D20816D Stolen Plate

**Event Time: 4:14:19 06/15/2024**

**Source: NCIC**

**Camera: #09 W 12th Ave WB @ S Deer Heights Rd**

**Network: Airway Heights WA PD**

Open in Browser

CP at 41. The requested Flock access history was not produced.

*Motions to suppress and dismiss*

Simonson filed a CrR 3.6 motion to suppress all evidence derived from use of the

Flock ALPR system as the product of an unlawful search and seizure. Simonson also

moved for dismissal under former CrR 8.3(b) based on the State's failure to preserve the

Flock data.

The trial court held an evidentiary hearing on Simonson's motions. Baunsgard

testified and explained the capabilities of the Flock ALPR system. He also testified that

he did not know why Deputy Flanagan did not archive the Flock image and associated

data. No evidence established what training, if any, Deputy Flanagan had received on the use of the ALPR system. Baunsgard testified he did not provide the audit log for production in this case.

*Findings of fact & conclusions of law*

The trial court entered comprehensive findings of fact and conclusions of law on both motions. The court considered all evidence and argument presented at the hearing, the briefing and submissions of the parties, and the court file inclusive of the probable cause affidavit of the arresting deputy. The trial court concluded it could not rule on Simonson's CrR 3.6 motion to suppress because it had insufficient evidence beyond the initial Flock "hit." The trial court stated:

> Without this information, the Court cannot determine whether law enforcement's intrusion into Mr. Simonson's private affairs required a warrant. It is impossible to determine the degree of technological surveillance to ascertain whether it was simply a sensory enhancement, or more like tracking a person's location and comprehensively chronicling their movements like a GPS [global positioning system] or cell tower location data that requires a warrant.

CP at 84.

The trial court further concluded in its CrR 8.3(b) analysis that "[t]he missing Flock data, including the ability to search other Flock cameras that may have been located on the route to the casino, is concerning. However, the limited time between the Flock Hit and law enforcement's arrival at the casino to find the stolen plate affixed to

8

the F-150 ten minutes later does not suggest that the destroyed Flock data is material or exculpatory to this charged offense." CP at 85. This was particularly true given the video evidence retrieved by the Tribal Gaming Authority that showed Simonson arriving alone in the truck and entering the casino. The court further concluded the Flock data was not material or exculpatory and, therefore, law enforcement's "failure to preserve [it was] not a denial a due process absent a showing of bad faith." CP at 85.

Also under its CrR 8.3(b) dismissal analysis, the trial court noted that "[c]riminal prosecutions must adhere to 'prevailing notions of fundamental fairness,' which includes a defendant's ability to present a complete defense." CP at 84 (quoting *State v. Armstrong*, 188 Wn.2d 333, 344, 394 P.3d 373 (2017)). The trial court rejected the State's argument that compliance with Flock's internal 30-day retention policy was evidence of good faith. The trial court concluded that "when law enforcement has digital evidence that is known to capture a specific action from which criminal prosecution is expected or likely to result, the policy requires retention until the matter resolves and appeals have been exhausted." CP at 86. The trial court noted that the State filed the possession of a stolen motor vehicle charge on June 21, 2024, which was well within the 30-day period in which the photo could be archived to avoid the vendor's data purge, and that defense counsel submitted written discovery requests on June 25. Baunsgard testified that the Flock data related to this incident should have been archived, but it was not.

No. 40732-2-III
*State v. Simonson*

Additionally, the trial court concluded that "[Flock]'s internal 30-day retention policy does not provide evidence of good faith." CP at 86.

The trial court then ordered:

> The destruction of the Flock data precludes an analysis of whether there was an impermissible search without a warrant, or whether it was a permitted *Terry*[5] detention based on a still image that is a permitted sensory enhancement. The digital evidence should have been retained and it is undisputed that it was not.
>
> Certainly, technological advances in law enforcement surveillance are efficient, help solve crimes, and can protect the public. However, fundamental fairness and due process mandate that the electronic surveillance data upon which the government relies to prosecute those accused with a crime be maintained and timely provided to afford a defense and a fair trial. The defense motion to dismiss pursuant to CrR 8.3(b) is GRANTED as in the furtherance of justice.

CP at 86-87.

The State timely appeals.

## ANALYSIS

1.      *Government misconduct under CrR 8.3(b)*

We review a trial court's decision to dismiss charges under CrR 8.3(b) for manifest abuse of discretion. *State v. Michielli*, 132 Wn.2d 229, 240, 937 P.2d 587 (1997). "A trial court abuses its discretion when its decision is manifestly unreasonable

_____

    5 *Terry v. Ohio*, 392 U.S. 1, 30, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

10

or based on untenable grounds or untenable reasons." *State v. Griffin*, 30 Wn. App. 2d 164, 170, 544 P.3d 524, *review denied*, 3 Wn.3d 1015, 554 P.3d 1227 (2024).

Former CrR 8.3(b) allows dismissal of an information on motion of the court "in the furtherance of justice" for "arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial." "It is well established that CrR 8.3(b) is designed to protect against arbitrary action or government misconduct." *State v. Moen*, 150 Wn.2d 221, 226, 76 P.3d 721 (2003). "Dismissal under this rule is an extraordinary remedy and is improper absent material prejudice to the rights of the accused." *Id*. A trial court should consider alternative remedies before resorting to dismissal under CrR 8.3(b). *State v. Wilson*, 149 Wn.2d 1, 12, 65 P.3d 657 (2003).

A defendant has the burden of proving, by a preponderance of evidence, both misconduct and a resulting prejudice to a fair trial. *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003). For the first prong, governmental misconduct "need not be of an evil or dishonest nature," rather, "simple mismanagement is sufficient." *State v. Dailey*, 93 Wn.2d 454, 457, 610 P.2d 357 (1980). For the second prong, a defendant seeking dismissal under CrR 8.3(b) must show that the governmental misconduct prejudiced their right to a fair trial. *Michielli*, 132 Wn.2d at 240.

Under the due process requirements of our state and federal constitutions, the State must preserve and disclose material exculpatory evidence. *State v. Wittenbarger*, 124 Wn.2d 467, 475, 880 P.2d 517 (1994) (citing *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)). "'Material exculpatory evidence'" possesses both an "exculpatory value that was apparent before it was destroyed and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Wittenbarger*, 124 Wn.2d at 475 (citing *California v. Trombetta*, 467 U.S. 479, 489, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984)). "A trial court's determination that missing evidence is materially exculpatory is a legal conclusion which we review de novo." *State v. Burden*, 104 Wn. App. 507, 512, 17 P.3d 1211 (2001).

If evidence is merely potentially useful rather than materially exculpatory, its destruction violates due process only if done in bad faith. *State v. Groth*, 163 Wn. App. 548, 557, 261 P.3d 183 (2011). Bad faith requires a showing that law enforcement knew of the exculpatory value of the evidence at the time it was destroyed or lost, and any destruction of evidence was improperly motivated. *Id.* at 558-59.

Here, the trial court found the Flock ALPR data was potentially useful, not materially exculpatory. Once this determination was made, Simonson had the burden to prove the State acted in bad faith by not preserving the data. The trial court never made a specific finding of bad faith. Instead, after acknowledging that "compliance with an

12

established policy regarding the evidence at issue is evidence of good faith," CP at 86, the trial court then faulted the State for its reliance on Flock's general internal 30-day data retention policy to make a showing of good faith. The court then concluded that Flock's "30-day retention policy does not provide evidence of good faith." CP at 86. The trial court improperly shifted the burden to the State to prove it acted in good faith. *Groth*, 163 Wn. App. at 559.

We do agree with the trial court's conclusion that the State's deviation from its own retention policy post-arrest amounts to governmental mismanagement. However, the trial court reversed the burden of proof when it found that the State failed to demonstrate it acted in good faith, rather than finding that Simonson met his burden of demonstrating the State acted in bad faith. Furthermore, while the incomplete discovery and retention policy violation may qualify as misconduct, the record before us does not support that the State was improperly motivated in failing to preserve the requested Flock data.

The trial court abused its discretion in dismissing the charge under CrR 8.3(b) absent a finding of bad faith.

## 2. *Prejudice under CrR 8.3(b)*

The trial court did not rule on Simonson's motion to suppress evidence from the Flock ALPR system, concluding that the destruction of data under Flock's general retention policy precluded analysis of whether a warrantless search occurred. Effectively,

13

the trial court concluded that Simonson was prejudiced because the court was precluded from deciding his motion to suppress under CrR 3.6 due to the destruction of the Flock data. Because Simonson's suppression motion under CrR 3.6 would have failed, the court erred in finding he was prejudiced under former CrR 8.3(b).

In an era of ubiquitous smartphones, surveillance technologies, and public data collection, questions frequently arise regarding the boundaries of personal privacy in public spaces. One such issue is whether individuals possess a reasonable expectation of privacy in the visibility of their vehicle's license plate while driving on public roads. This is particularly true when photographs of such license plates are taken by law enforcement or automated systems. However, based on established legal precedent and constitutional principles, no privacy right exists for the mere act of photographing a license plate in plain view on a public road.

Under article I, section 7, of the Washington Constitution, "No person shall be disturbed in [their] private affairs, or [their] home invaded, without authority of law." We apply "a two-step analysis to determine whether this provision has been violated." *City of Seattle v. Long*, 198 Wn.2d 136, 156, 493 P.3d 94 (2021). First, we review whether the action complained of disturbed one's private affairs. *Id*. Second, we review whether authority of law justifies the intrusion. *Id*.

"Under the Fourth Amendment [to the United States Constitution], a search occurs if the government intrudes into a subjective and reasonable expectation of privacy." *State v. Hinton*, 179 Wn.2d 862, 868, 319 P.3d 9 (2014). "Under article I, section 7, a search occurs when the government disturbs 'those privacy interests which citizens of this state *have held, and should be entitled to hold*, safe from governmental [intrusion] absent a warrant.'" *Id*. (quoting *State v. Myrick*, 102 Wn.2d 506, 511, 688 P.2d 151 (1984)). Generally, license plate checks are constitutionally permissible and do not infringe on a defendant's rights. *State v. Martin*, 106 Wn. App. 850, 860, 25 P.3d 488 (2001), *aff'd*, 148 Wn.2d 20, 60 P.3d 46 (2002). "'[I]nasmuch as the license plates on a motor vehicle are exposed to public view, the visual inspection of the plate number and subsequent [law enforcement] computer check of the information pertaining to those plates [does] not intrude on the legitimate privacy interests of the owner of the vehicle or passenger." [6] *Id*. (internal quotation marks omitted) (quoting *State v. Lewis*, 288 N.J. Super. 160, 671 A.2d 1126 (App. Div. 1996).

---

[6] The ability to visually inspect license plates, in the context of law enforcement searching drivers' license records, has been a collateral issue in the body of law since license plates were introduced in Washington. "Historically, Washington citizens have not enjoyed a constitutional protected privacy interest in their drivers' records." *State v. McKinney*, 148 Wn.2d 20, 27, 60 P.3d 46 (2002).

15

Here it is undisputed, that the Flock cameras are placed only along public roadways. Nevertheless, the trial court expressed concerns about law enforcement's use of the system:

> The expansive technological capabilities of the Flock system, which stores and retains searchable patterns of data that can be used to track a person's activities and use predictive AI [artificial intelligence], is far different than a single image taken from a fixed, motion-activated traffic camera placed on the side of a public roadway. Instead, it is more analogous to how cell towers can track a person's location and comprehensively chronicle their movements. [Spokane County Sheriff's Office personnel] provided their own example when searching stored historical Flock data to identify how an assault suspect had previously been frequenting other parks and trailheads.

CP at 83 (footnotes omitted).

Dustin Baunsgard of the Spokane County Sheriff's Office testified at the evidentiary hearing that law enforcement retains audit logs indefinitely showing specific queries of the ALPR cameras and the user's reasons for doing so. However, the State did not produce these audit logs to Simonson. Even if audit logs existed, the State did not preserve any of the photos, videos, or other data law enforcement would have viewed during the query. Without this information, the trial court reasoned it could not determine whether the system was being used as a permissible sensory enhancement, or if it was more like a tracking tool akin to GPS surveillance, requiring a warrant. Notably here, the arresting deputy inspected only one photograph from the Flock hit.

License plates are quintessential public identifiers required by statute to be displayed openly on vehicles operating on public roads. Former RCW 46.16A.200(5) (2022). The Flock camera captures a momentary public exposure that is akin to an officer manually noting a license plate number. While the Flock system as a whole potentially provides broader tracking capabilities than an officer's manual notation of a license plate, the amount of photographs taken of a license plate is inconsequential as, again, one does not have an expectation of privacy in their license plate while on public roadways. We also find uncompelling Simonson's comparison of Flock photographs to GPS monitoring or cellular phone data from towers. Unlike law enforcement affixing a tracking device to one's vehicle or combing through one's cellular phone data, both of which carry a reasonable expectation of privacy, the Flock cameras simply record the license plates of vehicles driven on public roadways.

The Flock ALPR system's photograph of the vehicle Simonson was operating in plain view on a public road did not disturb his private affairs under article 1, section 7 of the Washington Constitution. This momentary observation is analogous to a law enforcement officer visually noting a license plate number and conducting a routine check of licensing records, which has long been held permissible without implicating constitutional privacy protection. *See Martin*, 106 Wn. App. at 861-62. Because Simonson did not have a privacy interest in the publicly displayed license plate, his

CrR 3.6 motion would not have been successful.[7] Consequently, Simonson was not

prejudiced by the failure to preserve the Flock data.

3.    *Discovery violation as a basis for dismissal*

Simonson alternatively argues that this court should affirm the CrR 8.3(b)

dismissal on the basis of a CrR 4.7 discovery violation. Dismissal for discovery

violations is extraordinary; lesser remedies should be considered. *State v. Smith*, 67 Wn.

App. 847, 852, 841 P.2d 65 (1992). We may affirm on any theory established by the

pleadings and proof. *State v. Smith*, 177 Wn.2d 533, 540-41, 303 P.3d 1047 (2013)

(plurality opinion). Simonson did not, however, raise CrR 4.7 in the trial court as a basis

for dismissal, instead focusing on constitutional violations. The trial court dismissed

on due process grounds, not discovery violations. Because the record before us is

insufficient to affirm on the basis of CrR 4.7, we decline to address it on review,

without prejudice to Simonson to assert this argument in the trial court on remand.

---

[7] We also note that Deputy Flanagan's arrest of Simonson may have been attenuated from the Flock photograph. Regardless of how or why Deputy Flanagan arrived at the casino, the casino's surveillance video independently identified Simonson's control of the truck. The deputy's arrest followed discovering the Ford F-150 pickup in the parking lot of the casino, identifying Simonson via security footage, noting his sole possession of the vehicle, and hearing his implausible explanation. Additional evidence included Simonson having the keys in his pocket, claiming "John" lent him the truck, and his personal items being inside the truck. Generally, the State does not have to establish how or why a law enforcement officer arrived at a location, where they had a right to be, before independently perceiving the commission of a crime.

CONCLUSION

We reverse the trial court's order of dismissal and remand to the trial court for further proceedings consistent with this opinion.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Murphy, J.

WE CONCUR:

_____
Cooney, J.

_____
Fearing, J.P.T.†

_____

† George B. Fearing, a retired judge of the Washington State Court of Appeals, is serving as a judge pro tempore of this court pursuant to RCW 2.06.150(1).